IN RE ESTATE OF SWAN JOHNSON.

ANNA LOVISA JOHNSON ET AL., APPELLEES, v. ALBERT JOHNSON ET AL., APPELLANTS.

FILED FEBRUARY 5, 1917.   No. 18741.

1. **Witnesses:** CROSS-EXAMINATION. In a contest of a will on the ground of undue influence, if a proponent of the will, who is a beneficiary thereunder, is alleged by the contestants to have used undue influence to obtain the execution of a will favorable to himself, and becomes a witness in his own behalf and contradicts evidence of circumstances tending to prove undue influence on his part, the court should allow a free and complete cross-examination of the witness as to his conduct toward the testator prior to and in connection with the making of the will.

2. **Wills:** CONTEST: UNDUE INFLUENCE: EVIDENCE. If the proposed will recites a reason for disinheriting a son who is contesting the will on the ground of undue influence by those who are beneficiaries therein, it is competent, in connection with other evidence tending to show such undue influence, to prove that no such reason in fact existed.

3. **Trial: OFFER OF PROOF.** When a question is asked that does not "indicate to the trial court the relevancy of the testimony," it is not error to exclude the testimony, unless the party propounding the question informs the trial court as to the relevancy of the testimony, and an offer of proof will enable the trial court to determine whether the evidence is competent. When the condition of the record and the form of the question itself show that it is relevant and competent, no offer of proof is necessary. The many decisions of this court in regard to requiring an offer of proof should be so understood.

4. **Wills: CONTEST.** Every one is entitled to the control of his property while living, and by will to direct its use after his death. The trial of a proposed will is to determine whether it is in fact the will of the decedent rather than the will of interested parties who have procured its execution by undue influence.

5. ———: ———: **UNDUE INFLUENCE: EVIDENCE.** Evidence of statements of the decedent, not made at the time of executing the will, are generally held incompetent as substantive proof of undue influence, but such statements are received in evidence if they tend to prove the condition of mind of the decedent as to his unbiased inclination in the disposition of his property, and are not otherwise objectionable.

6. ———: ———: ———: **INSTRUCTIONS.** It is not in all cases true that "influence that amounts to undue influence must be such as to compel, overpower, and coerce one to do something which he does not want to do." Under the circumstances in this case it was error to so instruct the jury.

7. ———: ———: ———: ———. If undue influence is established by a preponderance of the evidence, the proposed will must be rejected. An instruction which tells the jury that unless they are convinced thereby they cannot reject the will is not accurate, and under some circumstances may be prejudicial.

8. ———: ———: **APPEAL: TRIAL DE NOVO.** Upon appeal to the district court from the judgment of the county court admitting a proposed will to probate, the district court tries all questions *de novo*. That court must determine whether the proposed will has been altered and the consequences of such alteration, if any.

APPEAL from the district court for Kearney county: HARRY S. DUNGAN, JUDGE. *Reversed.*

*Brown, Baxter & Van Dusen, Lewis C. Paulson* and *Thomas F. Hamer*, for appellants.

*Hague & Anderbery, contra.*

SEDGWICK, J.

The proposed will of Swan Johnson, deceased, was contested in the county court of Kearney county and there admitted to probate. Upon appeal to the district court for that county the probate of the will was sustained, and the contestants have appealed to this court.

The deceased was a retired farmer, living at the time of his decease at Axtell, in Kearney county, and he died about the 29th day of September, 1912. He left surviving him his wife, one of the proponents, Anna Lovisa and four sons, Edward H., Arthur G., Hardie L., and Albert Johnson, and one daughter Annie E. Jacobson, and two children of a deceased son, and Charles F. Johnson, a son of the decedent by a former wife. The decedent left property, real and personal, of value variously estimated from $36,000 to $50,000. This property consisted mainly of three farms of 160 acres each, and a house and lot in the town of Axtell. The proposed will devised the three farms, one to Edward H. Johnson, one to Arthur G. Johnson, and one to Hardie L. Johnson. To his wife he gave the town property, and a life interest in the three farms and all of his personal property. To his his daughter, Annie E. Jacobson, and his son, Albert Johnson, he gave each the sum of $3,600, and provided that these bequests should be paid by the devisees of the land, and that they should constitute a lien upon the land devised subject only to the lien of the widow's life estate. The principal grounds of contest were that the deceased "was not possessed of sufficient mental capacity to make a valid will," and "was not of sound mind and disposing memory," and that the execution of the proposed will "was brought about through undue influence" by his wife and his sons, Edward H., Arthur G., and Hardie L. Johnson, and that the deceased at the time of executing the proposed will was laboring under delusions and mistakes in regard to the value of his property and in regard to "certain indebtedness which he believed to be due from his son, Charles F. Johnson," with no such

indebtedness existing. It is now contended that the judgment of the district court is not supported by the evidence, and that the court erred in excluding evidence and in restricting the cross-examination of one of the proponents of the will.

At the time of signing of the proposed will, Charles F., the decedent's son by his former wife, was nearly 50 years of age, and was residing with his wife and children in Omaha. The decedent was about 70 years of age, and had been for several months suffering with a fatal disease, which caused him much suffering and caused his death a few weeks after the signing of the proposed will. The proponent, Edward, was residing on one of the farms of the decedent, a few miles from the town of Axtell, where the decedent was residing, and on Sunday, the day before the proposed will was signed, he, with the other sons to whom the farms were devised, were at the home of their father and mother, and the next morning Edward took the decedent to a lawyer's office, where the will was drawn and executed. There is evidence that Charles and Edward were not on friendly terms, and it is the theory of the contestants that Edward, with the assistance of his mother and the other substantial beneficiaries under the will, unduly influenced the decedent in executing the same. The proposed will states as the reason for disinheriting Charles that "I relinquish all right and cancel all indebtedness from Charles F. Johnson to me. * * * The indebtedness due me from Charles F. Johnson constitutes notes and debts which I paid for him about twenty-four years ago in the principal sum of about seven hundred dollars no part of which he has ever paid me." There is evidence that when Charles was a young man his father assisted him to obtain title to a piece of land, and that Charles occupied the land for some time and became indebted, the land being incumbered, and unable to finish paying for the land. It was thereupon arranged between Charles and his father,

at about the time mentioned in the foregoing quotations from the will, that Charles should convey title to his father and his father pay the indebtedness. This was done, and the decedent occupied the land for about two years and paid off all the indebtedness, and then sold the land, realizing about $1,000 more than he had invested in the land and the indebtedness, so that the recital in the will of the reason for disinheriting Charles was entirely contrary to the fact. No other reason is shown, and the evidence is that the decedent visited Charles and his family at Omaha, and that Charles, shortly before the death of the decedent, was at the home of the decedent for some weeks and took care of his father, and that the relations between them were all that could be desired between father and son. The fatal · disease with which the deceased was suffering was not of such a nature as to impair his mental faculties, but he had been a vigorous, active man, he had suffered for months, and fully realized that this disease and the suffering caused thereby would very soon end his life. Edward was then about 36 years of age, had not been living with his father for several years, but saw him frequently, and it would seem that their relations also were pleasant. The theory of the contestants is that, in this consultation of the family with the dying man on Sunday, the terms of the proposed will were arranged for him, and that he yielded to the dictation of his wife and her children, who caused to be repeated in his will the ungrounded reason for disinheriting Charles. It was therefore very important to know the nature of that consultation and the matters discussed and the manner of discussing them. On the trial evidence had been introduced of hostilities on the part of Edward toward his half-brother Charles, and tending to show that Edward had at times remonstrated with his father against any assistance to Charles. Other circumstances appeared in the evidence that might be considered to indicate that Edward was much interested

in preventing his father from recognizing Charles as an object of his bounty. The theory of the contestants was that these circumstances, in connection with the fact of this family consultation so soon before the proposed will was executed, and the fact that Edward was preferred in the proposed will tended to prove that Edward had used undue influence with his father. To rebut this theory Edward was called as a witness by the proponents and was asked, "You have heard the testimony of Albert concerning statements made by you, or purporting to have been made by you, at your father's home, upon various occasions?" and answered, "Yes, sir." He was asked: "Q. Did you at any time or at any place protest to your father in reference to extending credit to Albert? A. No, sir. Q. Or to Charley? A. No, sir. * * * Q. You heard Mrs. Vath's testimony, did you not? A. Yes, sir. Q. State whether or not you stated that Albert and Charles were not to have anything, as testified to by her. A. No, sir; I never said so. Q. Did you at any time make such a statement? A. No, sir. Q. You heard the testimony of Mrs. Albert Johnson? A. Yes, sir. Q. You heard her state that you have said on several occasions that neither Albert nor Charles should have anything? A. I never said so. Q. Did you at any time or to any person make such statements? A. No, sir." This evidence of Edward's amounts to a denial that he had used influence with his father in regard to the disposition of his property. It was clearly relied upon for that purpose, and on the cross-examination he was asked, "Q. You are the Ed. Johnson who came with your father to Minden the day this will was drawn? A. Yes, sir. Q. What time in the day did you get here?" This question was objected to as improper cross-examination, the objection was sustained, and exception taken to the ruling. He was then questioned, and answered, as follows: "Q. How frequently did you visit at your father's house during the last few months of his life? A. Whenever I would go

to town I would go down there and talk to him a few minutes; and we would go to church Sundays, and go there for dinner, and stay there a little while in the afternoon, and then go home. · Q. Were you there on Sunday, the 2d of July? A. Yes, sir. Q. Was Arthur there? A. Yes, sir. Q. Was Hardie there? A. Yes, sir. Q. Was Albert there? A. No, sir. Q. Was Charley there? A. No, sir. Q. Was Mrs. Vath, the mother of Emil's children, there? A. No, sir. Q. Was your mother there? A. Yes, sir. Q. Now, at that time did you make an arrangement with your father to come to Minden the next day?" This question was objected to as improper cross-examination, and the objection sustained, and the ruling excepted to. He was then asked, "At that time was the subject of the change of the will discussed?" to which a similar objection was sustained.

It is contended that the contestants cannot now object to this ruling because no offer of proof was made, and the following is quoted from the decision of this court in *Blondel v. Bolander,* 80 Neb. 531: "In order to predicate error upon the rejection of testimony, the party complaining of its exclusion must have made an offer of what he expected to prove, which would indicate to the trial court the relevancy of the testimony, and, in the absence of such offer, the action of the court in rejecting the testimony will not be reviewed." Many of the rules of evidence are necessarily precise and technical. The purpose of these rules is to elicit the truth, and not to set traps for the unwary. When a question is asked that does not "indicate to the trial court the relevancy of the testimony," it is not error to exclude the testimony, unless the party propounding the question informs the trial court as to the relevancy of the testimony, and an offer of proof, that is, a statement of the nature of the evidence sought by the question, will enable the trial court to determine whether the evidence is competent. This rule is sometimes, though rarely, enforced in cross-examination. When the condition of the rec-

ord and the form of the question itself shows that it is relevant and competent, no offer of proof is necessary. The many decisions of this court in regard to requiring an offer of proof should be so understood.

In *Isaac v. Halderman*, 76 Neb. 823, it was said by COMMISSIONER DUFFIE: "No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality and to provide for the wants of the testator's family, to protect those who are helpless, to reward those who have been affectionate, and to punish those who have been disobedient. * * * He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law." This, of course, is true if the document presented is in fact the will of the testator. The object of the trial is to ascertain whether it is his will, or is rather the will of those around him who seek to obtain the property for themselves.

When a man realizes that he is stricken with a fatal disease, a disease which causes excruciating suffering and must destroy his life in a short time, no matter how strong a man he may have been in health, he clings nervously to those of his relatives who may be around him. They represent to him all of the earthly support he has. If he alienates them, he must face the "King of Terrors" alone so far as things of earth with which he is familiar are concerned. And he is not always in a position to resist their influence. To take advantage of such a situation to have a brother unjustly disinherited is a fearful act, and yet it too often happens. The question then is whether the result is the will of the

deceased, or the will of those who surround him when the details are arranged. This question frequently places a difficult and embarrassing duty upon courts and juries. There can be no doubt that the testimony of Edward, offered in behalf of the proponents, was intended to rebut the conclusions indicated by the circumstances in evidence, that he had assisted in so influencing his father. There should have been the freest cross-examination in regard to the consultation on the Sunday preceding the execution of the proposed will, and the conduct of this witness generally as indicating whether he had attempted to influence the father to disinherit Charles and the children of another son deceased. The trial court erred in refusing to allow such cross-examination.

Albert Johnson, testifying for the contestants, was asked: "Q. On or about this time, Mr. Johnson, did you have any conversation with your father concerning the provisions of the will in so far as they related to your brother Charley?   A. Yes, sir.   Q. What was said at that conversation?"   This was objected to, and the objection sustained. The contestants then offered "to prove by this witness that at this conversation the father stated to the witness that he had always wanted to give Charles something, but that he was no longer his own boss, and had been prevented by the boys from doing so." The objection was still sustained, and the contestants excepted to the ruling. Such evidence, it is almost universally held, is not competent as substantive proof of undue influence; but, if the proponent had declared "that he had always wanted to give Charles something," evidence of that fact was competent as tending to show the condition of his mind and feeling toward Charles, and that part of the evidence offered should have been allowed.

The court also erred in striking out evidence as to the result of taking over Charles' farm by his father.

The court instructed the jury that "influence that amounts to undue influence must be such as to compel, overpower, and coerce one to do something which he does not want to do," and also that if they "find from a preponderance of the evidence that the proponents, Arthur G. Johnson, Ed. H. Johnson, Hardie L. Johnson, and Anna Lovisa Johnson, or some of them, exercised such influence over him at the time of signing the will that he was forced, coerced, and compelled against his will and against his judgment, * * * then and in that event said will would be executed under undue influence." This language was substantially repeated in other instructions. Under some circumstances, if it was contended that the testator had been threatened with bodily injury and through fear of such physical injury had been compelled to execute the will, then such language as this might be appropriate in the instructions to the jury. It was decided by the supreme court of Alabama that, where the principal legatee had occupied a confidential relation to testator, the burden is on him to show the absence of the exercise of undue influence. *Moore v. Spier,* 80 Ala. 129. When a party to be benefited by the will has the controlling influence in its formal execution, it is considered by the supreme court of Iowa to require close scrutiny and full explanation. *In re Will of Donnely,* 68 Ia. 126. The decedent, knowing that he was stricken with a fatal disease and that he could not live long, was surrounded by these four or five persons who are the beneficiaries under this proposed will, with whom he was living and upon whom he depended for support and consolation in his last hours, and under such circumstances it was not necessary that force, coercion, and compulsion should be used in order to amount to undue influence.

It is complained that the court instructed the jury that, unless they were convinced by a preponderance of the evidence that there was undue influence, they could not reject the will on that ground. There is some

Kriss v. Union P. R. Co.

merit in this complaint. If there was a preponderance of the evidence of undue influence, it would be sufficient to establish that fact, and the language of this instruction might allow the jury to remain still unconvinced, although there was such preponderance of evidence. When it appears from other instructions given and from the manner of the trial that the jury were probably misled by such an instruction, it will be held to be prejudicial.

It seems that the county court in admitting the proposed will to probate found that it had been altered since its execution. This was an appeal from that decision to the district court, and upon such appeal the district court tries all questions *de novo*. No question as to the alteration appears to have been submitted to the jury, and we are not referred to evidence in the record upon which the court acted in admitting the proposed will in evidence. This matter is not made very plain in the briefs, and it is difficult to tell what are the contentions of the parties in that regard.

For the reasons stated, the judgment of the district court is reversed and the cause remanded for further proceedings in that court.

REVERSED.

LETTON, ROSE and HAMER, JJ., not sitting.