IN RE ESTATE OF IGNATZ KAJEWSKI.
JOSEPH BOSHECK, APPELLANT, V. TERESA GAPPA ET AL., APPELLEES.
279 N. W. 185

FILED APRIL 15, 1938. No. 30236.

*Zacek & Nicholson* and *Johnsen, Gross & Crawford*, for appellant.

*Stillman & Ptak* and *Robert R. Moodie, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

DAY, J.

This is an appeal by the proponent, a legatee, and by the residuary legatee as intervener from a verdict and judgment denying probate of the purported will of Ignatz Kajewski, deceased. Objections to the probate of the will were that it was not legally executed; that the testator lacked testamentary capacity; and that it was procured under undue influence. The trial court withdrew the question of proper execution from the jury, and submitted the questions of testamentary capacity and undue influence. The jury found generally in favor of the objectors.

The appellant contends that the trial court erred in submitting the issues of testamentary capacity and of undue influence to the jury. He also insists that, even if there were sufficient evidence to submit the question of undue influence to the jury, the court should have submitted separate forms of verdict as to each legacy, and not merely general verdicts for the proponents or contestants. The intervener, St. Joseph's Home for Aged, particularly objects to the forms of verdict submitted to the jury for that its situation was different from that of the proponent of the will. The proponent of the will was Father Bosheck, pastor of St. Mary's Church, of which church the testator was a member. The testator was, for a period of about eighteen years during his lifetime, janitor of the church, the parochial school, and the rectory. The trial court correctly instructed the jury as to the difference between Father Bosheck and the Home for Aged when it instructed the jury that, if any beneficiary occupied any confidential relation with testator, it

became his duty to show that the purported will was not signed by the testator through undue influence. Surely under the circumstances the Home for Aged did not occupy any such confidential relation with the testator as that of priest and parishioner. The jury were given clear, detailed and specific directions as to the law applicable to the proponent and the intervener on the question of undue influence. The jury were in no wise misled by the instructions. Upon the question of undue influence, it had been held by this court that the will may be invalid as to one exerting the undue influence, and valid as to one legatee for whom no influence was present. Where a will contains a bequest due to undue influence, it may stand as to other bequests not so procured. *In re Estate of Koller,* 116 Neb. 764, 219 N. W. 4. A careful annotator states: "The authorities, with but few exceptions, support the general proposition that parts of a will may be held valid and enforceable, notwithstanding the fact that other parts have been affected by undue influence and are invalid; provided, however, that the parts so affected are separable, so that the will remains complete and intelligible in itself." 69 A. L. R. 1129. This statement is supported by the citation of many cases from various jurisdictions. The trial judge recognized this rule in his instructions to the jury. But both the proponent and the intervener complain that he erred in submitting only two forms of verdict to the jury for their use. One finding generally for the proponent, and the other for the contestants. This, it is said, had the effect of instructing the jury either to admit the will for probate or to hold it invalid. The trial judge is not required to submit forms of verdict to the jury, and it is only done for the convenience of the jury. Where, as in this case, the jury were clearly instructed as to the findings allowable, and were not misled by the forms of verdict submitted, it is not prejudicially erroneous to omit to submit forms of all possible verdicts.

The jury were not misled and the record does not dis-

close that they asked for further instructions. The parties objecting here, and for the first time in the motion for a new trial, did not object at the time the instruction was given, or request that an instruction be given as to the other possible forms of verdict. It is the rule of this jurisdiction that an objection to the forms of verdict should be made before or at the time the verdict is returned. *McGrew Machine Co. v. One Spring Alarm Clock Co.,* 124 Neb. 93, 245 N. W. 263.

It is complained by the appellant (proponent) that the evidence is insufficient to sustain a finding that the purported will was procured by undue influence. In the first place, it seems clear that, if any undue influence was exercised, it was not that of intervener, St. Joseph's Home for Aged. The will was executed in the hospital, and where the testator subsequently died. The Sister Superior in charge of the hospital and of the Home for Aged was called into the testator's room to witness, not the signing of the will, but the mark of the testator. The evidence of the objectors does not indicate that she had any ulterior motive in the matter. She was requested to sign as witness to the testator's mark, and apparently in a desire to be helpful to him complied with the request. She did not know of the contents of the will, and did not make then, or at any prior time, any suggestions as to the disposal of his estate. The Home for Aged was the residuary legatee under the proposed will. It is well settled in this state that the burden of proving that a will resulted from undue influence is ordinarily upon the contestants who assert it. *In re Estate of Kees,* 114 Neb. 512, 208 N. W. 637; *Stull v. Stull,* 1 Neb. (Unof.) 380, 96 N. W. 196; *In re Estate of Wilson,* 114 Neb. 593, 208 N. W. 961; *In re Estate of Bayer,* 119 Neb. 191, 227 N. W. 928.

It will be noted that there was no evidence introduced by the contestants sufficient to submit the question of undue influence to the jury as to the intervener, St. Joseph's Home for Aged. Mere suspicion of undue influence upon

the testator as to the proposed will is not sufficient to require a submission of the issue to the jury, or to sustain a verdict for the contestants. *In re Estate of Bayer, supra; In re Jackson's Estate*, 220 Mich. 565, 190 N. W. 762.

But the situation is slightly different as to the proponent of this will. Father Bosheck was the pastor of St. Mary's Church, and the superintendent of the parochial school connected with the church. The testator, Ignatz Kajewski, had been janitor for this church and school for about eighteen years. He was in such position when Father Bosheck became pastor, about three years before his death. The testator was a member of St. Mary's Church, and Father Bosheck was his spiritual adviser. The testator lived in the rectory with the priest. He assisted in the execution of the will in the manner delineated. When the testator was taken suddenly ill and removed to the hospital, the last rites of the church were administered to him by the assistant pastor. Father Bosheck advised him to make a will if he had any property requiring disposal. Subsequently an attorney, called at the request of the testator, went to the home of Father Bosheck and asked that he accompany him to the hospital. Father Bosheck did this, and at the request of Ignatz Kajewski made four different trips from the hospital to the testator's room in the basement of the rectory to bring certain specific articles to him. The testator knew well that which he possessed, and was not satisfied until it had all been brought to him. Father Bosheck testified that he did not know the extent of the testator's possessions, and it is evident that, had he known, so many trips would not have been necessary. The attorney gives a good account of the circumstances surrounding the execution of the will. Father Bosheck testified to the situation, as did also the witnesses to the will. Father Bosheck secured these witnesses from among visitors to the hospital. However, Father Bosheck and the testator having the relation of priest and parishioner, the burden of proof fell upon Father Bosheck to establish that he had not

exercised undue influence as alleged by the contestants. As has been stated, the contestants have the burden of proving that the proposed will was the result of undue influence in all cases where that is alleged, except in cases where the person charged with exercising undue influence sustains a confidential relation to the testator and is a beneficiary. *In re Estate of Lodge,* 123 Neb. 531, 243 N. W. 781.

As was stated by the court in the instructions, there arises a presumption of undue influence in the case of a confidential adviser who is a beneficiary. The rule is sustained by the following authorities: *In re Estate of Noren,* 119 Neb. 653, 230 N. W. 495; *In re Estate of Strelow,* 120 Neb. 235, 242, 231 N. W. 837, 233 N. W. 889. In the latter case, after an oral argument for rehearing, it was held: "In a will contest, where undue influence is alleged, that question should be submitted to the jury when the facts and circumstances proved, together with inferences fairly deducible therefrom, are such that reasonable minds might conclude that the will was not the free and voluntary act of testator, but the result of undue influence exercised upon him."

It is therefore announced as the rule of this jurisdiction that the question of undue influence should be submitted to the jury where the circumstances attending the execution of the will are such that reasonable minds might conclude from the evidence that it was not the voluntary act of the testator.

A well known authority states: "It is the general rule in practically all jurisdictions that undue influence is presumed and the burden of proof shifted so as to require the beneficiary to produce evidence which at least balances that of the contestant, when, in addition to the confidential relation, there exist suspicious circumstances, such as the fact that the beneficiary took part in the preparation or procuring of the will, or actually drafted it or assisted in its execution, or that the testator was weak-minded or in frail health and particularly suscep-

tible to influence, or that the provisions of the will are unnatural and unjust." 68 C. J. 759. Another recognized authority states the matter as follows: "It is the generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence." 28 R. C. L. 146, sec. 100. The last text states that those consequences follow only when the beneficiary has been actively engaged in the execution of the proposed will. There are other circumstances also mentioned in the above text when the same consequences follow. The burden is upon a beneficiary of a will, when a confidential relationship existed, and where the testator is aged and infirm and makes an unnatural and unjust will, to disprove that the purported will is the result of his undue influence.

In the case at bar the appellant was the beneficiary of the testator's will, but the evidence discloses clearly that his assistance was merely that of a minister or instrument. At the request of the lawyer he accompanied him to the testator's room at the hospital. At the request of the testator he made four different trips to the room in the rectory which had served the testator to secure evidences of his ownership of property. The testator was not satisfied until he had been brought all his certificates of deposit, as well as the other evidences of his assets. None was found afterwards. The priest requested two visitors to the hospital to witness the will. He requested the Sister Superior to witness the mark. He did not suggest the disposition of any of the assets of the testator. Both the attorney and he testify as to all these circumstances surrounding the execution of the will. There is no testimony to the contrary on behalf of the beneficiaries. The evidence establishes that Father Bosheek did not interest himself in the contents of the proposed will.

The jury were correctly told that, as to the case of one

who assisted in the preparation of the will and benefited thereunder, there was a presumption that undue influence secured the will. Of course, in some criminal cases a presumption is said to be evidence, and sometimes statutes make the evidence of certain facts *prima facie* evidence of the commission of the crime. But generally presumptions are not evidence, but are merely the rule by which evidence is to be weighed and considered. In the ordinary sense a presumption is not evidence at all, but is based upon the probative strength as a matter of reasoning and inference of the evidentiary fact. The presumption is not the fact itself, but the legal consequences that are attached to it. In the present case there is no evidence of any facts from which an inference may be drawn, but the use of the presumption, which would indicate that the will was procured by undue influence. Therefore, since the presumption is the only evidence of undue influence, and the presumption is not evidence, there is no evidence sufficient to submit the question of undue influence to the jury as to Father Bosheck.

A well known authority states the rule as follows: "The presumption arising from evidence of trust and confidence may be rebutted by proof that the testator had competent independent advice or that the will was his own voluntary act, or by other evidence. Even though the contestant of a will makes out a *prima facie* case of undue influence, the proponent does not then have the burden of proving absence of undue influence, but only of rebutting the *prima facie* case with some evidence in states where the burden is on the contestant." 1 Schouler, Wills (6th ed.) sec. 311. In the present case there is no evidence on the part of the contestant which makes out a case of undue influence except alone the resort to the presumption which is not sufficient.

Another well known authority states as follows: "The better reasoned authorities hold that a presumption is not evidence of a fact, but purely a conclusion, having no probative force, and designed only to sustain the burden

of proof until evidence is introduced tending to overcome it. 'A presumption * * * cannot in itself possess probative weight, but merely necessitates evidence to meet the *prima facie* case which it creates. When evidence is introduced rebutting the presumption, the presumption disappears, leaving in evidence the basic facts which are to be weighed.' " 1 Jones, Commentaries on Evidence (2d ed.) sec. 30.

The evidence in the present case is that Father Bosheck, at the request of the testator, made several trips to secure certain papers evidencing the ownership of property, and .that he did not act as scrivener of the will nor make any suggestions as to the disposition of the property. There is a total absence of proof that he exercised any influence in the procuring of the will, and the matter of undue influence as to Father Bosheck was erroneously submitted to the jury.

This court said: "Ordinarily, in a civil action, a presumption is not evidence, but a mere rule of law, and disappears when evidence on the subject is given." *Auld v. Auld*, 122 Neb. 576, 240 N. W. 756. And still more recently this court said: "The presumption against death by suicide prevails when the cause of death is unknown, but disappears when evidence is introduced tending to show the cause of death." *Falkinburg v. Prudential Ins. Co.*, 132 Neb. 831, 273 N. W. 478. A court of a near-by state gives the rule in the following language: "A presumption is not evidence of anything and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until *prima facie* evidence has been adduced by the opposite party, but the presumption should never be placed in the scale to be weighed as evidence." *Honrath v. New York Life Ins. Co.*, 275 N. W. (S. Dak.) 258. The presumption of undue influence on the part of Father Bosheck disappears when confronted with the evidence in the case disclosing that there

was in fact no procurement of the will by such influence, but that it was in fact the will of Ignatz Kajewski.

The will, under the circumstances disclosed, is not an unnatural one. The contestants, about twenty-three in number, are the sister and the nieces and nephews of the deceased. Only the sister and one nephew were present and actively participated in the contest. In fact, the record discloses that some of them had not been informed of the issues in this case, and that their names had been added to the list of contestants without their knowledge or permission. Neither of the contestants present at the trial, and only a single one of the others, attended the funeral of the deceased. They did not visit together often, and the correspondence was extremely meager. The letters in the record from the testator to all his relatives numbered five, the first written in 1920, and the last in 1928, and they do not indicate a close relationship. The contestant, Frank Gappa, had tried to borrow money from his uncle, the testator, in 1931, and was refused. At the time of his father's funeral the deceased was present. The father was a widower, his deceased wife having been the sister of the testator. While the family was together, the nephew, Frank Gappa, one of the two contestants present here, and Ignatz Kajewski were talking about another sister of testator, Mrs. Teresa Gappa, now living in Oklahoma, and who is also an active contestant of the purported will. The gist of the conversation was that the sister was very sick and needed financial help. But neither the nephew nor the deceased contributed anything to her aid in this serious and chronic illness. At the time of the execution of the will the deceased talked about his relatives, and stated that he did not wish to leave them anything. He stated that his sister, Mrs. Teresa Gappa, was probably dead as a result of her chronic illness, but even if she were not it was immaterial. The testator had not seen or visited with this sister for approximately twenty-five years. The provisions of the will were certainly consistent with his living relationship with his relatives, and,

under the circumstances, were not unnatural. It is asserted that the testator was old and infirm on March 14, 1935, but sufficient answer to this is that he knew what property he had, and where it was located. He was not satisfied without all of it, and sent Father Bosheck again and again until he had found it all in his room. There is evidence that he was sick, but no evidence that as a result of his sickness he was capable of being unduly influenced. Applying the rules applicable, there is neither evidence nor circumstances attending the execution of the will that might lead reasonable minds to conclude that the proposed will was not the voluntary act of the testator. An unavoidable suspicion amounts to nothing more than a presumption which is overcome by evidence that the testator made his will as he saw fit.

Of course, the foregoing is predicated upon the assumption that the testator had testamentary capacity. The objectors contend that he did not.

Ignatz Kajewski had been employed as janitor for St. Mary's Church and the parochial school in connection with the church for many years. When he was noticed to be unable to work because of an infection in his leg, and taken to a hospital, he executed his will. Father Bosheck, pastor of St. Mary's Church, and his assistant, advised Mr. Kajewski to make a will disposing of his property, although they did not advise any particular disposition. The will provided:

"Last Will and Testament

"Know all men by these presents: That I, Ignatz Kajewski, of West Point, Cuming county, Nebraska, considering the uncertainty of this mortal life and being of sound and disposing mind and memory and under no restraint or compulsion do hereby make, publish and declare this to be my Last Will and Testament in manner and form following, that is to say:

"First: I order and direct that my funeral expenses, expenses of last sickness, expenses of administering my estate, and all claims and demands of every nature

against my estate be paid by my executor hereinafter named as soon as possible after my death.

"Second: After the payment of the debts and expenses as provided in paragraph First I give, devise, and bequeath all of my property, real or personal of every kind or nature whatsoever, of which I may die seized, as follows:

"1. To the Pastor of St. Mary's Church West Point to be used and distributed for masses to be said for my soul the sum of $1,000.

"2. To Rev. Anton Paschang the sum of $500.

"3. To the Benedictine Fathers of Mt. Angel Oregon the sum of $500.

"4. To Rev. Joseph Bosheck all the money I may have in the banks at Panama and Portsmouth, Iowa, or in the hands of the trustees for the depositors for said banks being the State Bank of Portsmouth and the Panama Savings Bank.

"5. All the rest of my liberty bonds remaining—being what I received from Father Peitz I give to St. Mary's Church, West Point.

"6. All the rest of my property I give to St. Joseph's Home at West Point.

"Third: I hereby appoint John J. Gross to be the executor of this my said will.

"Fourth: I hereby revoke any and all former wills by me at any time made.

"In witness whereof I have hereunto set my hand this 14th day of March, 1935.

"Witness to mark

"Sister M. Antonella      Ignatz  X  Kajewski
                    "(Attestation clause)"

According to the inventory the gross value of the estate is about $7,000. When he died on March 20, 1935, of streptococcic infection originating in his right leg, he was seventy-four years of age. He entered the hospital on the evening of March 13, 1935, and on the following afternoon, March 14, he made his will. The circumstances

attending the execution of the will have been further set out elsewhere in this opinion, but are applicable to this issue presented and are elaborated somewhat here. An examination of the evidence shows that witnesses who associated with him testified relative to his mental capacity. Schmitt, a clothier, knew him for almost the entire time of his residence in West Point. The testator transacted ordinary business and discussed other matters with him in his store. The witness visited him in the hospital on the evening of March 14, after the execution of the will. At that time the face was not flushed, although complaint was made of pain in his leg. The conversation was carried on in the same way it had been in the business dealings in the store.

Smith, an undertaker and furniture dealer at West Point, testified that he had known Mr. Kajewski about eleven years and had sold him glass and other materials used around the church, school and rectory. He had conversed with him on these many business transactions as well as on the ordinary affairs of life. Late in the afternoon of March 14 he was in the hospital on business, and noticed in passing his room that the testator was in bed. When he had finished his business at the hospital he stopped two or three minutes to visit with Kajewski. In response to the question of why he was there, he told Smith: "Well, they tell me my leg is sore. I don't know what business I got here. I don't feel bad." The witness did not recall any other conversation, and stated that his appearance and talk were normal.

Hugo, a plumber, had known Kajewski for about seventeen years, and during the past twelve years he had done some work at the church and school. He had become "more or less" intimately acquainted with the deceased, and had seen him at least once each week. He had visited him in the hospital on the evening of the 13th and again on the 17th. On the first visit Kajewski was rational and sound. Again he testified that the testator appeared to be one of sound mind, giving him the keys to the church and

the school with the specific instructions as to the details of the work. When this witness saw him on the 17th he was weaker and more nervous, but his mental condition "was good as ever," and he was not irrational.

These witnesses were clearly associated with the deceased for many years prior to his demise. Another was Luke Tierney, who lived at the Home for Aged. He knew Kajewski and visited with him every day in the hospital. He had known him ever since 1928 when he had first resided at the Home. The witness observed his mental condition during that time, and it was normal. On the day the will was executed he saw Kajewski three times, at 7:00 a. m., 11:00 a. m., and 5:00 p. m., and each time he asserts that his mental condition was normal.

The hospital charts were received in evidence, and together with the testimony of the superintendent nurse showed that Kajewski had a temperature all the time he was in the hospital. He had a temperature on March 14, and at 10:00 p. m. he was irrational and wanted to get out of bed.

The testimony of the attorney, John J. Gross, and others, has already been recited to the effect that he knew the property he had and was cognizant of his relatives. These witnesses were present at the execution of the will and testified as to the attending circumstances. The other witnesses other than the Sister, who was head nurse at the hospital, were Frank Gappa, a contestant and nephew, and Dr. G. Alexander Young, an alienist, who answered a hypothetical question as an expert. Frank Gappa was forty-two years of age, the son of a sister of Ignatz Kajewski. The deceased lived with his sister and her family, including the nephew, Frank Gappa, at Palo Alto, Iowa, but left there around 1912 or 1913. The nephew testified as to his actions around the farm home. He worked with him one year. The deceased never married, and never went out with girls. He smoked his pipe when he had finished his work, and he left alone even the other members of the family. He never visited his rela-

tives in Iowa very much because he feared losing his job.

These facts about the deceased about twenty-five years before were incorporated in a hypothetical question which was asked of Dr. G. Alexander Young, and in his answer he expressed the opinion that Ignatz Kajewski was of unsound mind on March 14, 1935. Of course, there are many other facts included in a long hypothetical question that is submitted to the witness. The witness never knew or saw Ignatz Kajewski, and his opinion is based solely on the facts as developed at the trial. The witness gave three sets of facts which he stated were of importance in determining this question. The first set of facts concerns the mental make-up of Ignatz Kajewski. In this category are listed his failure to have girl friends, and his persistent avoidance of the company of women; the fact that he was a bachelor at the time of his death; the fact that he avoided others, especially strangers; the fact that he was adversely affected by a storm and that he was continually fearful of losing his job. The second set of facts is that, although he had a safety deposit box, he kept his property hidden in his room in an unsafe place; and the third set of facts is that, although he had a serious blood infection, he did not see a doctor; and took care of it himself. "These facts," testified the witness, "are indication of a morbid change in this man's mind due to old age and to the infirmities that are attendant upon old age."

Several of those closely associated with the deceased during his lifetime testify that he was of sound mind. They base their conclusions upon actual transactions and visits with him. The evidence is that he directed the disposition of his property. He alone knew of its extent and the places where it was kept. He sent Father Bosheck to his room four times, and was not satisfied until each particular paper evidencing his ownership of the property had been secured. The statutes insure to every one of mature age and sound mind the right to make a will and dispose of his property as he wishes. *In re Estate of Johnson*, 100 Neb. 791, 161 N. W. 429.

It has been held by this court that any one who understands the nature of the act, the extent of his property, the proposed disposition of it, and the natural objects of his bounty is competent to make a will. The evidence indicates that Ignatz Kajewski qualified in every particular. The only evidence, if evidence that be, which justifies a submission to the jury is the opinion of the expert witness that when Mr. Kajewski made his will he was of unsound mind. Is this sufficient to take the question of testamentary capacity to the jury? We think it is not in view of the fact that all the other evidence shows that he was competent.

Mr. Kajewski accumulated all of his property, approximately $7,000, during his lifetime. He was employed at menial labor as a janitor around the church, the school and the rectory, and was paid, according to the evidence, a very insufficient amount to account for the estate which he left. As such janitor he conducted the business of buying glass for the buildings, and the other supplies that were needed. He was able to buy his own clothing and to look after his own business at that time. Still, the opinion of the expert as to his mental unsoundness was based upon facts which occurred during and before that time.

Where a will is contested on the ground of mental incapacity, it is insufficient to submit the issue to the jury on such a question when the only supporting evidence is that of an expert witness in opposition to testimony of actions and circumstances which show mental incapacity. *In re Spinner's Estate*, 248 Mich. 263, 226 N. W. 862.

A well known authority states that, where the evidence is against incapacity, the issue should not go to the jury if other evidence clearly establishes capacity. 68 C. J. 1082. This well known authority cites as illustrating the rule the following: "In a contest of a will on the ground of mental incompetency, testimony that in the opinion of witnesses the testatrix was not mentally competent to

make and execute the will, that she did not know the nature and extent of her property, that she was crazy, irrational, and made exaggerated statements as to the nature and extent of her property, was insufficient to raise a question for the jury as to whether she was incompetent at time of execution of the will, in view of the undisputed fact that she dictated her own will, the will itself negativing completely all such testimony. *In re Walz's Estate,* 215 Mich. 118, 183 N. W. 754." *In re Spinner's Estate, supra,* held: "Against the physical fact that testator actually made a will which was his own handiwork and which demonstrated mental competency, the lay and medical testimony did not raise an issue of fact for the jury."

In this case the reasons given by the expert witness were weakened on cross-examination and neutralized the effect of his testimony. He testified on cross-examination that if the testimony showed that Kajewski called for all his property, including certificates of deposit, and that he withheld fixing the amount of one of the bequests until he had checked the amount, it would indicate that he had a comprehension of the nature and extent of his property. If the testimony showed that he knew his relatives and expressed that he did not want to leave them any property, it would indicate that he had comprehension of his relatives, but would indicate a morbid change in his emotional condition. And, finally, the witness testified: "I think he knew what he was doing with his property, there is no question about that. * * * I think he did not know the natural objects of his bounty." The positive evidence disproves this theoretical conclusion. Furthermore, one of the reasons for the conclusions given was the keeping of papers in his room instead of in his box in the vault. On cross-examination he said if these papers had no intrinsic value the conclusion would be otherwise as to that matter. They had no such value. In a similar situation one court said: "Evidence of testamentary incapacity held insufficient to take case to jury; effect

of uncertain opinion of physician being neutralized by his admission on cross-examination that testator had sufficient mind and memory to understand and do everything necessary in making of valid will." *Broyles v. Able,* 208 Ky. 672, 271 S. W. 1040.

The rule applicable may be stated briefly as follows: Evidence of testamentary incapacity is insufficient to require submission of the issue to the jury if the conclusion of the medical expert is weakened on cross-examination by an admission that he comprehended the extent and nature of his property, and it definitely appears from this record that he knew his relatives.

Where there is evidence in the record, as in this case, that the testator actually made a will and disposed of his property according to his own wishes, and that he accumulated his property and was able to take care of it and other ordinary transactions of life, the opinion of the expert, based solely upon a hypothetical question, is not sufficient to require that the issue be submitted to the jury.

The trial court erred in submitting the issue of undue influence and testamentary capacity to the jury, and the judgment is reversed and the cause remanded for a new trial in conformity with this opinion.

REVERSED.

ROSE, J., dissents.