IN RE ESTATE OF CHARLES NELSON, DECEASED.
JOHN LARSON V. MARTIN THORSON ET AL.

FILED DECEMBER 20, 1905.    No. 13,915.

1. **Wills: COMPETENCY.** Where a testator, though aged and infirm, understands the nature of the act he is performing, knows and can retain in mind the amount and character of his property, and who are or naturally should be the objects of his bounty,

and has a full understanding of the persons or institutions to whom and the purposes for which his devises and bequests are made, he is competent to make a will.

2. **Harmless Error.** Where a verdict and judgment is the only one that could be supported under the evidence, errors in the rulings of the court are without prejudice and will not be considered.

ERROR to the district court for Saunders county: BENJAMIN F. GOOD, JUDGE. *Affirmed.*

*Simpson & Good,* for plaintiff in error.

*V. L. Hawthorne, J. L. Sundean* and *S. H. Sornberger,* contra.

LETTON, C.

On July 25, 1903, Charles Nelson, who was an old Swedish farmer, residing in Saunders county, made a will whereby he left all of his property, consisting of an 80 acre farm and some personal property, to certain charitable and educational institutions connected with the Swedish Lutheran church. On October 2 of the same year Nelson died. The will was filed for probate with the county judge of Saunders county, when objections were filed to the probate and allowance of the same by Nelson's widow and by John Larson, a brother of Nelson, who resided in California. The objections made to the probate of the will denied the execution of the same and the testamentary capacity of Nelson, and also alleged that it was procured by the fraud and undue influence of one J. E. Swanbom. Upon a hearing the will was admitted to probate, from which order John Larson appealed to the district court. From a judgment and verdict in that court sustaining the will, John Larson prosecutes error to this court.

At the time of his death Charles Nelson was in his 78th year. He had been a resident of Saunders county and had lived upon the farm from the time that he first

homesteaded it, a period of more than 30 years.   Twenty-two years ago, and before he was married, a part of his brother's family lived with him for some time upon the land, but he had not seen his brother for many years, nor had the families been intimate for a long period, though Larson and his family had lived in Omaha up to four years before this time.   Nelson was a member of the Swedish Lutheran church at Mead, Nebraska.   For three or four years prior to his death he had been ailing more or less, his debility increasing with his years, and for some time prior to the date of the execution of the will, while he was able to be up and around the place, he was not strong enough to do any work except a few chores, and for some years he had rented his farm, though caring for his stock himself most of the time.   It appears that he relied upon a neighbor and friend to advise him with reference to the marketing of his grain and stock, to sell the same for him, and to deposit the money received in the bank.   On July 23, 1903, he wrote to J. E. Swanbom, the pastor in charge of the church at Mead to which he belonged, asking him to come to see him.   Swanbom went to the farm the next day, when Nelson told him that he wanted him to draw up a will for him.   Swanbom objected, saying he was not well fitted for this, suggesting that Mr. Sundean, a lawyer at Wahoo, could talk Swedish with him and was better qualified to draw up a will.   Nelson asked him to call up Sundean by telephone and ask him to come out.   In the same conversation he told Swanbom he intended to make a will of his property to some benevolent institutions and asked him which were most in need of support.   In response to this Swanbom named the institutions which benefit by the will.   The next day Swanbom and Sundean went to Nelson's house, and Sundean drew up a will in accordance with Nelson's directions. At that time he told Sundean who his relatives were, stated that he had no children, that he did not want to leave any of his relatives any property, and both Nelson and his wife said that they wanted the will made so

their relatives would get nothing. Sundean suggested that he make no bequest for his wife, but provide for her maintenance and support, and that the institutions should get nothing until after his wife's death, and the will was drawn up in accordance with these suggestions. Nelson was able to be up and about, and was sitting in the room with his clothes on. Swanbom testifies that a year before this time Nelson had told him he had no children, said that his heirs did not care for him and that he intended to leave the property to a benevolent institution. The day before the will was made, Nelson told Swanbom that Mr. Henning, a neighbor, wanted him to make a will giving the property to his brother, John Larson. Sundean testifies that during the conversation with reference to the provisions of the will Nelson talked connectedly and intelligently, that he spoke slowly, but that there was no incoherency in his conversation; that in writing the will he wrote Mr. Nelson's name as "Charles N. Nelson," and that when he read the will to him Nelson said that he had no middle initial, and the name was changed accordingly; that there was some discussion with reference to the manner in which the Luther Academy, one of the beneficiaries, should use the money, and also whether that left for mission purposes should be for foreign missions or missions of the synod, and also with reference to the manner of employment of the bequest to the Augustana College and to the Orphans Home. Sundean's testimony in substance is that Nelson acted in an intelligent manner throughout the whole transaction and was apparently competent to transact business.

On the part of the contestants there was testimony by one Bergren, a neighbor, to the effect that five years before his death Nelson had rented his farm land to him; that Bergren usually advised him as to when he ought to sell his crop and stock, and marketed it for him; that the year before his death he seemed a little childish, and remarked on the rapidity with which Bergren had put up his hay, when in fact the usual time had been employed; that

he attempted to pay $20 for this work, when half of this amount was enough; that at that time Nelson was weak, and walked with a cane; that in April, 1903, the witness was assessor in that precinct, and Nelson told him, when assessing, he had about 30 head of cattle, when in fact he only had 9 calves; that when asked how much money he had he said he did not know, that the bookkeeper at the bank could tell him; that in May, 1903, Nelson told him that he would go over to Mead and have a will made out, that he was going to give his property to his brother, Larson, that he had a sister, but he did not want her to have any of it. This witness further testifies that he did not think Nelson capable of doing business the last year of his life, but on cross-examination he testified that he talked to him for an hour the last of May, 1903, as to making a will, and that he seemed to understand what he wanted, and why he wanted it, and that at this time he seemed to know what he wanted to do with his property, the nature of his property, and who he wanted to have it, and that in respect to making his will he was sane enough. One Henning testifies that on June 23, 1903, Nelson talked to him about his will; that he told him that Swanbom wanted the property for churches and charity; that he would not give it to him, and that his brother should have the land, and his wife should have the personal property. He further testifies that in May and June, 1903, he did not think Nelson was in sound mind at all times; that he was unsound sometimes and sometimes sound. Henning's testimony is corroborated by that of his wife and son with relation to Nelson's physical and mental condition, and on cross-examination Mrs. Henning testifies that in June he spoke about making his will; about leaving his property to his brother; that he said he would not leave it to charitable institutions; that his wife was to have her support as long as she lived; that he had helped his sister all he wanted to; that Larson had helped him, and that for that he was going to have it; that he seemed to understand his obligation to his brother,

and to understand that he was not under obligations to his sister nor to these charitable institutions. Mrs. Nelson testifies that the Sunday before the will was made Nelson brought in two axes, put one in his bed and one in the kitchen; that he took a stick or club and drove nails in one end so as to project; that he brought it in and said he was going to have it to protect them.

The testimony as a whole shows testamentary capacity on the part of Nelson, and just as plainly fails to show the exercise of any undue influence. It shows a condition of mind and body of the testator at the time the will was made such as is not uncommon in men or women of such advanced age who have pursued a life of toil. Physical and mental decay had evidently begun, but Nelson was still able to be about the house, and, while subject to an occasional vagary or lapse of memory, his mental grasp of the facts with reference to his property, his duties so far as his wife and his brother and his sister were concerned, and his intention as to the use to be made of his property, was amply sufficient to make him competent to dispose of his estate. Neither is there sufficient evidence to show undue influence. A year before he had expressed the idea of leaving his property for benevolent purposes. A month after the will was made he was told there was still time and opportunity to change it, if he so desired, but he refused to alter it. The conversations which have been narrated by the witnesses wherein Nelson spoke of making his will, whether to his brother, John Larson, or to the charitable institutions to which his property was eventually left, seem to have been carried on by him with a clear understanding of what his property consisted of, to whom he desired to leave it, and their relations to him. The fact that at times he expressed an intention of leaving his real estate to his brother, his personal property to his wife, and depriving his sister of any share of his bounty, affords of itself no ground for believing that when he changed his mind he was unduly influenced to do so. If the testamentary dis-

position of property may be set aside because the testator
made a different will from that which he at some former
time had expressed an intention to make, but few instru-
ments of this nature would ever be admitted to probate.
From the whole evidence we are satisfied that Nelson pos-
sessed testamentary capacity at the time the will was
made and that no undue influence was exercised.

The plaintiff in error has called our attention to certain
alleged errors in regard to the admission of opinion evi-
dence as to the capacity of Nelson to make a will, and also
has complained of certain instructions given by the trial
court.  We deem it unnecessary to consider these asssign-
ments for the reason that, if a verdict and judgment had
been returned for the contestants in this case, we would
have found it our duty under the evidence to have set it
aside as against the clear weight of evidence.  No other
judgment than that which has been rendered would be
proper under the testimony in this case.  For this reason,
the errors, if any, which are complained of were without
prejudice and need not be considered.

We recommend that the judgment of the district court
be affirmed.

AMES and OLDHAM, CC., concur.

By the Court:  For the reasons stated in the foregoing
opinion, the judgment of the district court is

AFFIRMED.