IN RE ESTATE OF BRIDGET SWEENEY.

PETER O'MALLEY, EXECUTOR, ET AL., APPELLANTS, v. STATE OF NEBRASKA ET AL., APPELLEES.

FILED DECEMBER 24, 1913. No. 17,348.

1. Wills: PROBATE: PARTIES. A proceeding in the probate court to settle the estate of a decedent is a proceeding *in rem*, and every one interested in such settlement is a party in the probate court whether he is named or not, and this is particularly true as to the distribution of an estate under a will.

2. Descent and Distribution: PARTIES. An order of the county court in the settlement of an estate, by which distribution is made of the assets, is appealable to the district court, the proceeding being *in rem*, and all persons interested in the distribution of such assets will be considered parties; and, if A asks for an order of distribution that will exclude B from participation in the

In re Estate of Sweeney.

assets, he cannot afterwards object to the appearance of B for the purpose of protecting his interest in the county court, or afterwards upon appeal to the district court. *In re Estate of Creighton*, 91 Neb. 654.

3. ———: ———. Where the court is called upon to determine the probate of a will, it is acting upon the *res* of the estate, and when an appeal is taken from the county court by the executors to the district court it removes the whole case to the district court, and all parties interested in the distribution are necessarily parties in the district court and are entitled to be heard there. Following *In re Estate of Creighton*, 91 Neb. 654.

4. Wills: PROBATE: APPEAL: BURDEN OF PROOF. When the proponents in this case took the case to the district court for the purpose of having that court probate the will and determine that it was valid, they took it there with the burden upon them to prove its due execution and the capacity of the testatrix to make it at the time of such execution.

5. ———: ———: TESTAMENTARY CAPACITY: REVIEW. The evidence examined, and *held* that the executors failed to establish the testamentary capacity of Bridget Sweeney at the date of the alleged will, and that their failure to prove the will and establish it, as required by the statute, leaves them without any standing in this court.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*George E. Bertrand* and *Guy R. C. Read,* for appellants.

*Mahoney & Kennedy, contra.*

HAMER, J.

This case had a beginning in the county court of Douglas county. It was to probate the will of Bridget Sweeney. She died May 5, 1909, in Douglas county. The will was dated January 28, 1909. It was offered for probate upon the petition of Peter O'Malley who was named therein as executor. It was filed in the county court of Douglas county May 28, 1909. That court fixed the hearing for June 7, 1909. It ordered notice by publication, and this was given. On June 7, 1909, James P. English, who was

the county attorney for Douglas county, filed objections to the probate of said will. He alleged that he did it under instructions from the attorney general and on behalf of the state of Nebraska. His claim was that the state of Nebraska was interested in said estate by reason of the fact that the deceased died without heirs, and, if intestate, "her entire estate will escheat to the state of Nebraska, and contestant objects to the probate of the alleged will now on file in this court for the reason that at the time the said deceased is stated to have executed said will she was of unsound mind and incapable of making any testamentary disposition of her property." There was a motion on behalf of Peter O'Malley to dismiss the objection of the state, for the reason that the state was not a proper party, had no interest, and that neither the attorney general nor the county attorney had authority to appear in that court or in that action; that said objections did not state facts entitling the state to the relief prayed for by it, and that the contestant was not entitled to appear or be heard. The county court overruled said motion, and found that said instrument was not the last will and testament of Bridget Sweeney and that it should not be admitted to probate. August 5, 1909, Peter O'Malley and Ellen O'Malley, hereinafter called the proponents, filed their appeal bond in said case, and the same was approved, and subsequently they perfected their appeal from the said judgment of the county court to the district court.

On February 19, 1910, John Burchill and Michael Burchill filed in the district court their petition of intervention in said proceeding, in which they alleged that they were the heirs at law of the deceased, Bridget Sweeney, being the sons of John Burchill, deceased, who was a half-brother of Bridget Sweeney. In their petition they recited the proceedings theretofore had, and alleged that by reason of their relationship to the deceased they had an interest in the matter in litigation and in the successful upholding of the order of the county court denying probate; that at the date of the will the testatrix was a woman

of advanced .years, in feeble health of body and mind, being of unsound mind and incapable of making any testamentary disposition of her property; that the signature of Bridget Sweeney to said will was procured by the improper acts and undue influence exerted over her by Ellen O'Malley, the chief beneficiary therein, and her family. The proponents, Peter O'Malley and Ellen O'Malley, severally moved to dismiss the petition of intervention because it did not state facts sufficient to entitle the petitioners to intervene; that they were not entitled to intervention; that the petition was filed too late; that the action was begun in the county court and tried there, and setting up the date of the judgment rendered and the date of their appeal. The motions to dismiss were overruled.

On the 23d day of May, 1910, the Burchills filed an amended petition of intervention, substantially the same as their original petition, with the additional allegation that the interveners had no knowledge of the death of Bridget Sweeney, nor of the proposed probate of said will, nor of the objections thereto by the state of Nebraska for several months after said proceedings took place; but affiant (Michael Burchill) "did not learn said facts until this cause was pending in this court." The proponents then severally moved to dismiss the amended petition of intervention, repeating substantially their motion against the original petition, overruled June 14, 1910. Proponents further moved the court to strike certain portions of said amended petition therefrom, from paragraph 7 the words, "a woman of advanced years, in feeble health of body and mind," and from the same paragraph the words, "and that the pretended will offered for probate is not the will of Bridget Sweeney," and all of paragraph 8 introducing the new issue that the signature to said will was procured by the undue influence of Ellen O'Malley and her family, for the reason that said allegations' changed the issues presented to and tried by the county court; the sole question there being raised by the objection that "she was of unsound mind and incapable of making any testamen-

tary disposition of her property." Said motions were overruled and exceptions taken. The proponents then answered, admitting the allegations recited in the record, adopted the original petition for probate as part of their answer, and specifically denying the remaining portions of said petition. The state of Nebraska did not appear in the case after the trial in the county court, and made no appearance whatever in the district court. There was in the district court a trial, a verdict, and a motion for a new trial, and a judgment denying the probate, from which judgment Peter O'Malley and Ellen O'Malley appealed to this court.

On behalf of the appellants it is argued that the intervention of the Burchills, who were designated in the appellants' brief as the defendants, was too late. There is quoted from section 50a of the code, the following: "Pending or to be brought in any of the courts of the state of Nebraska, * * * either before or after issue has been joined in the action, and before the trial commences." It is alleged that the Burchills might have intervened in the county court either before or after issue joined between the proponents and the state, or before the trial commenced in that court; but that thereafter they were precluded from intervening either in that court or in any other court to which the case might be taken. It is further alleged that, conceding for the purpose of this argument the rights of the contestant to intervene, they could not in the district court interject into the record a new or additional objection to the probate of the will. It is also alleged that the court erred in overruling the proponents' motion to strike from contestants' amended petition the new issue of "undue influence" made by paragraph 8, as well as the objectionable words of paragraph 7. It was argued that the issue presented was doubly objectionable; that, in addition to its being a changed issue, it was contrary to the old issue which was retained—that the testatrix was of unsound mind and incapable of making any testamentary disposition of her property. As a part of

the argument it was said that "undue influence in this regard can only be exerted upon one who has testamentary capacity." It was further urged that the court erred in giving its instruction upon undue influence and in submitting this issue to the jury, and in submitting to the jury a separate finding on this subject, because there was no evidence tending to support a finding that there was "undue influence" exerted or attempted. To this there was the retort of the contestants that the jury's finding on the subject was in favor of the proponents, and, consequently, that there was no prejudicial error.

Bridget Sweeney at the time of her death was 80 years old. The instrument presented as the last will and testament of said Bridget Sweeney purported to make some small gifts to charity, and then undertook to dispose of the remainder of her property, which consisted of about $8,000 in money, by the seventh paragraph. It reads: "As neither my husband John Sweeney, deceased, nor myself have any brothers, sisters, or near relatives, it is my will, and I give, devise and bequeath to my dear friend Ellen O'Malley, who for many years has been near and dear to me, all the rest, remainder and residue of my property both real estate and personal property of any nature whatsoever of which I may die seized or possessed." At the trial of the case there was a general verdict, in which the jury found that the instrument offered for probate was not the last will and testament of Bridget Sweeney, deceased. There were also special findings in respect to interrogatories submitted by the court. (1) "Was Bridget Sweeney on January 28, 1909, of sufficient mental capacity to make a will?" A. "No." (2) "Was the signature of Bridget Sweeney to the document dated January 28, 1909, procured by the undue influence of Ellen O'Malley and her family?" A. "No." After the return of the foregoing verdict and special findings there was a motion for a new trial filed by the proponents, and the same was overruled, and judgment entered finding the instrument was not the last will and testament of Bridget Sweeney.

The appellants contend, first, that the Burchills should not have been permitted to intervene after the case had been appealed to the district court. This question seems to have been considered in *In re Estate of Creighton*, 91 Neb. 654. In that case it is said in the second paragraph of the syllabus: "An order of the county court in the settlement of an estate, by which distribution is made of the assets, is appealable to the district court; the proceeding being *in rem*, all persons interested in the assets are parties. If A asks for an order of distribution that will exclude B from participation in the assets, he cannot afterwards object to the appearance of B to protect his interest in the county court, or afterwards upon appeal to the district court." In that case it was said in the body of the opinion that the proof of the so-called unnamed heirs presents unquestioned authority to stipulate the proposition that the decree of the probate court in the settlement of estates upon matters within the jurisdiction of that court is final unless appealed from, and cannot collaterally be attacked. It was also said that the disposition of that question did not determine the question of the right to appear in the district court after the case had been appealed. The court then makes reference to the case of *Blatchford v. Newberry*, 100 Ill. 484, and says: "What that court decided v is that new parties could not appear and present new issues in the appellate court. This, however, does not decide the question that is before us. The proceeding in the probate court to settle the estate of a decedent is a proceeding *in rem*. Every one interested is a party in the probate court, *whether he is named or not*, and this is particularly true as to the question of the distribution of the estate. Under our statute it is not necessary to give any notice of the hearing upon the distribution of the assets of the estate. Everybody interested in that distribution is a party to the proceeding, whether he has appeared in the probate court in the proceeding or not, and so, if the state, in behalf of this charity, was interested in the distribution of the assets

in the probate court, it was necessarily a party before that court, *whether it appeared there or not.* The court was acting upon the *res* of the estate, and not upon the persons interested in it. Therefore, it seems to follow that, when an appeal was taken by the executors to the district court, it removed the whole case to the district court, and all parties interested in the distribution were necessarily parties there and entitled to be heard."

It would seem that the position of this court in that case is amply sustained by the authorities and by the reason of the rule. In contemplation of law the Burchills were parties to the proceeding in the county court; but, whether so or not, the appeal was by the proponents, and not by the contestants. The case was dropped by the state in the county court and the state did not again appear; but between the proponents and the contestants there remains the final contention. The proponents took the case to the district court on appeal. Under the decision quoted, if they took it there, they took it there as against all persons whose rights might be affected by admitting the instrument to probate. They took the same there to have the will probated, to have it determined that it was the last will and testament of Bridget Sweeney. When the proponents took the case to the district court for the purpose of having that court probate the will and determine that it was valid, they took it there with the burden upon them to prove its due execution and the capacity of the testatrix to make it at the time of its execution. They failed to establish the testamentary capacity of Bridget Sweeney at the date of the alleged will. Their failure to prove the will and establish it as required by law leaves them without any standing.

A brief review of the facts should be given as they are shown by the evidence. Richard O'Keefe knew the deceased in Cornwall, England, 52 or 53 years before her decease. She was then a woman past the age of 30 years. Her husband, John Sweeney, was a man of middle age at that time. He was a laborer in the tin mines of Cornwall.

Mr. O'Keefe understood that they had come from the county of Cork, Ireland. They never had any children born to them. John Sweeney came to Omaha in September, 1869, and Bridget Sweeney came a couple of years later. For six or seven years prior to the time when they were sent to St. Joseph's Hospital, Mr. O'Keefe had not seen Mrs. Sweeney to speak to her. Peter O'Malley was in the service of the Union Pacific Railroad Company. He became acquainted with John Sweeney in 1870, and Mr. Sweeney worked for him in the Union Pacific Railroad shops. Mrs. O'Malley became acquainted with Mrs. Sweeney in 1876, and the two women visited each other. Mrs. Sweeney worked more or less for Mrs. O'Malley. About 10 years before the Sweeneys were sent to the hospital they lived in a little shack on Mason street in the city of Omaha. Mrs. O'Malley claims to have visited them on Christmas before they were sent to the hospital. Perhaps she did so also upon other occasions. John Sweeney had saved up a considerable sum of money. He had converted his savings into cash. He had ample funds with which he and Mrs. Sweeney might have lived in decent comfort. The evidence shows that they buried their money under the shack, or otherwise concealed it, and that they lived in filth and misery, without sufficient food, and with very insufficient clothing, and almost no shelter and almost no fuel. They seemed to have forgotten how much money they had and where it was, and they were apparently forgotten or lost sight of by their former friends and neighbors.

The Reverend Peter McLaughlin was the pastor of St. Peter's Catholic church in Omaha. He knew John and Bridget Sweeney for about 14 or 15 years. He had a passing acquaintance with them for a longer period of time. When found, they were living in a very dilapidated shanty. It consisted of two rooms. The wind blew through it. It was anything but clean. In the bedroom there was a bed and one chair. In the other room there was a stove, a little table, and another chair. There was no plumbing

in the house, and no running water in the house or on the premises. The kitchen utensils consisted of a couple of cups and some plates. There was a box that looked like a dry-goods box which served for a cupboard. It was one day in June when Father McLaughlin was told that John Sweeney had wandered away from home. In searching for him Father McLaughlin went to the police station. The detectives then looked for the money that Mr. Sweeney was supposed to have about the house. The search resulted in discovering $2,000 in one place, and $8,000 in another. The $8,000 consisted of gold coin. This sum of $8,000 was found in a crock in a hole under the floor. Father McLaughlin took John Sweeney to Mercy Hospital in Council Bluffs, and subsequently brought and placed him in St. Joseph's Hospital in Omaha. Mrs. Sweeney was with her husband in these hospitals. Father McLaughlin testified to the condition of the little shack in which they lived; that their bed was unclean; that Mrs. Sweeney was deaf and said very little, except to talk about her rheumatism; that what she said was generally incoherent; that she was incapable of anything like conversation; that in his opinion Mrs. Sweeney was then of unsound mind. Father McLaughlin had known the mental condition of Mrs. Sweeney for about four years.

W. J. Deverees, a police officer assigned to the detective division of the Omaha police department, testified: That he went to the Sweeney home because informed that John Sweeney had disappeared. He knew nothing about any money being buried about the premises. Mrs. Sweeney did not think that her husband was in the cellar. Mr. Deverees descended into a sort of dugout below the shack. After he had gone down into the dugout and had lit two or three matches there for the purpose of seeing whether Mr. Sweeney was there, he came up and went outside and searched among the weeds, and went down to the railroad, and then came back to the house and found Mrs. Sweeney standing in the cellar, or part of the way down into the cellar. She asked him to give her back the money. She

said that they were a poor old couple and that all they had
in the world was this money.  Up to that time Deverees
had known nothing about any money.  On inquiry he was
told that the Sweeneys had sold a lot, and that it was be-
lieved that they had money in the house.  Deverees was
then joined by another detective, and they went down into
the dugout or cellar.  There they found something between
the sills on top of the ground and under the floor, and
about on a level with the last step.  This was a heavy
bundle wrapped in paper.  They asked Mrs. Sweeney if
that was the money, and she said it was.  They unwrapped
the paper and found a sack tied up inside of it.  $2,000
were found in this sack.  During this time a search was
going on for Mr. Sweeney.  He was found down by the
river.  They took Mr. Sweeney with them to the house,
but he was unable to locate the remainder of the money.
The officers continued to dig around in the cellar, but
neither of the Sweeneys could help them to find the
money.  They had buried it, but had lost it and did not
know where it was.  The officers found $225 wrapped up in
a little cloth and hidden in an old nail keg with a lot of
nails and screws.  They found $12 or $15 in bills in the
bed, and they found $8,000 in a jar buried in the cellar.
The only food in the house was a soup bone in an old
kettle and some dry bread in a box.  The bed was unclean.
The plaster was off the walls.  The little house was practi-
cally uninhabitable.  Mrs. Sweeney was unable to talk
intelligently upon any subject.

Mr. John J. O'Connor testified that he was a lawyer of
many years' practice; that he resided in Omaha; that he
had known the Sweeneys; that he had been consulted by
them for many years; that he knew that the $10,000 which
they buried was the result of the sale of a lot; that after
the Sweeneys were sent to a hospital he represented Mrs.
Sweeney in appealing from an order of the probate court
placing her under guardianship; that she told him that
she remembered Peter O'Malley and Dick O'Keefe, but
that she did not know Mrs. O'Malley; that after Mr.

Sweeney's death Mrs. Sweeney became very melancholy; that she failed rapidly both mentally and physically; that while Mrs. Sweeney was at the O'Malleys Mr. O'Connor visited her there; that her conversation was in fragments; that she could not follow a conversation, and that she would answer "yes" or "no" to a question, and then she would wander off and talk of something else; that she could not carry on a continued conversation and did not for months before she went to the O'Malleys.

There is something of a review of the facts and a review of the law in a case bearing some similarity to this one in *In re Estate of Paisley,* 91 Neb. 139. In that case the contestants had the judgment in the county court, which denied probate of the will, and the proponent appealed to the district court. On the trial in the district court the proponent had the verdict and the judgment, and there was an appeal to this court by the contestants. It was contended by the contestants that the verdict was contrary to, and was not sustained by, the evidence. The contestants were collateral heirs of the deceased, and they contested the will on·the grounds of the mental incapacity of the testator and undue influence on the part of the widow in procuring its execution. In the body of the opinion it is said: "Undue influence and weakness of body and mind are often closely allied, and it may be difficult to tell exactly which may have been the stronger factor in bringing about the result in any given case where the testator is enfeebled by illness, and has disregarded the natural objects of his bounty and has devised all, or the greater part of his property, to a stranger or to one whose integrity of purpose may well be questioned because of his conduct and his apparent self-interest as the chief beneficiary of the will, and because of his opportunity to exercise undue influence upon the testator."

In 1 Underhill, Law of Wills, sec. 125, it is said: "The mental and physical capacity of the deceased is to be considered in determining what degree of influence will vitiate his will. * * * The will of one whose independ-

ence has been weakened by indulgence in dissipation, or whose stamina, physical or mental, has been broken by illness or old age, may be easily overcome. * * * Every case depends wholly upon its own particular facts and attendant circumstances." Section 137: "The fact that the party superintending the execution of the will, or the person who propounds it for probate, takes a large benefit under it, is a circumstance raising a suspicion of undue influence."

Upon an examination of the evidence in this case, we are of the opinion that the general verdict of the jury that the will was not the last will and testament of Bridget Sweeney was correct, as was, also, the special finding that she was not of sufficient mental capacity to make a will. Insufficiency of mental capacity to make a will and undue influence may both be found in an examination of the following cases, which seem clearly to sustain the view to which we have come, that the testatrix was without sufficient mental capacity to dispose of her property at the time the will was executed: *Higginbotham v. Higginbotham*, 106 Ala. 314; *Bevelot v. Lestrade*, 153 Ill. 625; *Rivard v. Rivard*, 109 Mich. 98; *Gordon v. Burris*, 141 Mo. 602; *Perret v. Perret*, 184 Pa. St. 131; *Orchardson v. Cofield*, 171 Ill. 14; *Baker v. Baker*, 102 Wis. 226; *Hampson v. Guy*, 64 Law T. Rep. n. s. (Eng.) 778; *Hall v. Hall*, 18 Law T. Rep. n. s. (Eng.) 152; *Carroll v. Hause*, 48 N. J. Eq. 269; *Purdy v. Hall*, 134 Ill. 298; *Brown v. Fisher*, 63 Law T. Rep. n. s. (Eng.) 465. *Hegney v. Head*, 126 Mo. 619; *Sheehan v. Kearney*, 82 Miss. 688; *Whitelaw's Ex'r v. Sims*, 90 Va. 588; *Miller v. Miller*, 187 Pa. St. 572; *In re Estate of Normand*, 88 Neb. 767; *Seebrock v. Fedawa*, 30 Neb. 424.

By section 126, ch. 23, Comp. St. 1911, it is provided: "Every person of full age and *sound mind* may, by his last will and testament, in writing, bequeath and dispose of all his personal estate remaining at his decease, and all his rights thereto and interest therein, and all such estate not disposed of by the will shall be administered as intestate

estate." It will be seen that only persons of sound mind may bequeath and dispose of personal estates.

The judgment is fully sustained by evidence of a most convincing character and by precedent. The judgment of the district court is

AFFIRMED.

FAWCETT and SEDGWICK, JJ., concur in the conclusion.