IN RE ESTATE OF FRIEDRICH BOSE.
FRED BOSE, APPELLANT, V. MRS. C. F. KNUTZEN ET AL.,
APPELLEES.
285 N. W. 319

FILED APRIL 14, 1939.   No. 30486.

158

*Kingsbury & Kingsbury, Sidney T. Frum* and *William P. Warner,* for appellant.

*P. F. Verzani* and *W. D. McCarthy, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

EBERLY, J.

This is a will contest in which the validity of an instrument purporting to be the last will of Friedrich Bose, deceased, and a codicil thereto are involved. The petition for probate is in the usual form. Objections to probate were filed by Mrs. C. F. Knutzen, a daughter, and Ernest, Herman, William, Albert and Fredrick Rieth, grandsons, challenge the validity of the instrument in suit, on the grounds that the same is not executed as required by law, or properly attested; that the testator at the time of the execution of said instrument, "by reason of old age and general mental inability," was not possessed of sufficient mental capacity to make a will; that the execution of this instrument was secured by, and due to, improper and undue influence exerted upon the deceased by Fred Bose, Jr., a son of deceased, and Rosina Bose, wife of said son, and that said instrument had been revoked by implication.

These issues were tried to a jury, and, after the evidence in chief of proponent had been received and the testimony in behalf of the objectors had been adduced, the trial court sustained a motion of the objectors for a directed verdict in their behalf, denied the application of proponent to introduce further evidence, and, after overruling proponent's motion for a new trial, entered a judgment in conformity with the motion sustained. By the terms of this judgment, "the Last Will and Testament and the Codocil thereto of the said Friedrich Bose, deceased," was "vacated, annulled, set aside and held for naught" and probate thereof denied, "for the reason that on the day of the execution of said Will, to wit, July 21, 1933, and of the Codicil, June 30, 1934, the alleged Testator, Friedrich Bose, deceased, was not possessed of testamentary capacity; and was on said dates incompetent to execute a last will and testament. And for the further reason that said deceased was unable to understand the English language; and the evidence shows that said instruments were not interpreted to him." The proponent appeals.

The following facts appear, either as admitted in the record or established without any substantial dispute, viz.: Friedrich Bose, the person executing the instrument presented for probate, died at the home of his son, Fred Bose, Jr., on January 26, 1937, and at the time of his death had attained the age of 100 years and 26 days. He was a native of Germany and migrated to this country and first settled at Cincinnati, Ohio, about 1866 or 1867. He there followed his trade of blacksmith for about two years. He then, with his family, removed to Saunders county, Nebraska, and settled on a farm, but continued blacksmithing in connection with his farm work. In 1892 the family home was removed from Saunders county, Nebraska, to Dixon county, Nebraska, where he had purchased a farm near Concord. He subsequently added to the original purchase, and owned a half section when he died, which appears to be unencumbered. His wife died in 1902. They had six children, four of whom preceded him in death. The eldest son, Fred

Bose, Jr., proponent herein, and his daughter, Mrs. C. F. Knutzen, an objector, were the sole members of his immediate family who survived his death. The record furnishes no basis for the conclusion that he brought any substantial amount of money with him at the time of his migration from Germany to the United States, or that any substantial inheritance was thereafter received by him from the land of his nativity. Such evidence as we have before us clearly indicates that the accumulations he possessed at the time of his decease were the result of the hard work, frugal and industrious habits, and good judgment of the deceased, aided by the assistance of the members of the immediate family so long as they continued to reside with him. His descendants also multiplied so that, at the time of his death, 33 grandchildren, 67 great grandchildren, and at least 2 great, great, grandchildren survived him. Fred Bose, Jr., the eldest son, married shortly after the death of his mother. The father then came to live with Fred Bose, Jr., and his bride, and thereafter made his home with them until in 1906 when the father went to Germany, where he remained for about 20 years, returning to this country in 1926, and again making his home with Fred Bose, Jr., proponent herein, and his family on the farm near Concord. Here he resided until his death in January, 1937. While his father was in Germany, Fred Bose, Jr., acted as his father's representative, as to the latter's property. Fred himself farmed 160 acres of the land, the home place, where he had lived continuously since he was nine years old. Another brother, John, farmed the remainder of the half section. Rents including his (Fred's) own were collected and remitted to Germany to the father while the latter continued to sojourn in that country.

The record indicates that, prior to his departure for Germany in 1906, Friedrich Bose had executed a will. As to the terms of this first will, the record is silent. In 1927, in company with Gottlieb Rieth, a son-in-law, and father of five of the contestants in the instant case, and Reverend Hildebrans, the then minister of a German church of which

Friedrich Bose was then a member and a regular attendant, the present testator appeared at the office of C. A. Kingsbury, an attorney at law, and employed the latter to draft his will. It appears that Rieth was a German, familiar with the German language, and that he understood both "high" and "low" German. Aided by the German minister, and Rieth, there is no, question but that Friedrich Bose's desires were properly interpreted and communicated to the attorney, and the will of 1927 then drafted by him truly expressed the will of the testator. To Fredrick Bose, his son (by the terms of this instrument), was given the home farm, viz.: The southeast quarter of section 15, and also the east half of the northeast quarter of the northeast quarter of section 15, all in township 28, range 4, east of the 6th P. M., in Dixon county, Nebraska. To John Bose, his son, was given the other 140 acres of his half section, and John was also to receive certain buildings situated on the lands devised to Fredrick Bose. John was charged with the payment of $3,000 and Fredrick Bose, Jr., was charged with the payment of $4,000, to be made for the benefit of Charles Bose and the three sisters, who were to receive the sum of $2,000 each. Charles Bose, having already received, by loan or otherwise, from the father the sum of $1,000, was to receive but $1,000. After the execution of the 1927 will, the will executed by the testator prior to his departure for Germany in 1906 was destroyed. On July 21, 1933, Friedrich Bose requested his son Fredrick to take him to Ponca, Nebraska, to the office of C. A. Kingsbury, the attorney who had drawn for him the will of 1927. The evidence adduced by proponent is that, in the absence of the son Fredrick, the testator, Friedrich Bose, dictated his desires to Mr. Kingsbury, the attorney, locating the lands he desired to devise from a map, and that in accordance with his direction the will of 1933 was drawn, read over to him, approved, executed by him, and then and there published as his last will, in the presence of two competent witnesses who, in compliance with his request, signed their respective names thereto as witnesses, in the presence of

the testator and in the presence of each other. In addition, the testamentary clause, to which these signatures of these witnesses were appended, was in regular form, and the recitals thereof evidence the proper execution of the will in suit.

By the terms of the 1933 will, testator's children, Thresa Knutzen, Hulda Koch, Augusta Rieth, and the children of his deceased son, John Bose (per stirpes), and the children of his deceased son, Charles Bose (per stirpes), were devised the 140 acres of land given to John Bose by the terms of the will of 1927.

To "Fredrick Bose, with whom I have made my home for years past," was devised by the testator the identical land given him by the will of 1927. Both of the tracts of land were devised and the respective devises thereof were relieved of the payment of any sums of money whatever, and the devise to Fredrick Bose also included "all improvements thereon," and further recited, "which land this day is conveyed by deed by me to my said son, Fredrick Bose."

Thereafter, a grandson, Alfred Bose, becoming indebted for rent to Friedrich Bose, and being unable to pay, on June 30, 1934, Friedrich Bose caused a codicil to be drawn and executed by him in due and proper form, making the amount of the claimed indebtedness, $565, a charge against the distributive share of Alfred Bose which that grandson would receive in his estate under the will of 1933.

Preliminary to a consideration of the conflicting evidence in this case, it is to be observed that, as stated by this court in *Isaac v. Halderman,* 76 Neb. 823, 107 N. W. 1016:

"Courts and juries are not warranted in setting aside last wills and testaments, and substituting in lieu thereof their own notions as to what a testator should do with his property, except upon satisfactory evidence. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of

either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality and to provide for the wants of the testator's family, to protect those who are helpless, to reward those who have been affectionate, and to punish those who have been disobedient. In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality."

The foregoing observations were quoted substantially, and approved, by Sedgwick, J., in *In re Estate of Johnson,* 100 Neb. 791, 161 N. W. 429.

Nor, indeed, is it the policy of our law to deem the aged to be deprived of these valued rights by the mere lapse of passing time. Our tribunals guard jealously the rights of all people including the aged when not imposed upon to make wills. We might adopt in this regard the language of Chancellor Kent found in *Van Alst v. Hunter,* 5 Johns. Ch. (N. Y.) *148, viz.:

"It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities."

In *Banks v. Goodfellow,* 22 Law Times Rep. n. s. (Eng.) 813, Lord Cockburn, C. J., of the Queen's Bench, quoted with approval the principle thus announced by Chancellor Kent, and continues, viz.:

"For these reasons the power of disposing of property in anticipation of death has ever been regarded as one of the most valuable of the rights incidental to property, and there

can be no doubt that it operates as a useful incentive of industry in the acquisition of wealth, and to thrift and frugality in the enjoyment of it."

See, also, *McCrocklin's Admr. v. Lee*, 247 Ky. 31, 56 S. W. (2d) 564; *In re Will of John Ashley*, N. F. Rep. 1884-1896, p. 447; *Aggas v. Munnell*, 302 Pa. St. 78, 152 Atl. 840; *Will of Grosse*, 208 Wis. 473, 243 N. W. 465.

Not only are the principles above referred to in harmony with the development of our doctrine in this state, but we have expressly declared, viz.:

"A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will." *In re Estate of Frazier*, 131 Neb. 61, 267 N. W. 181.

The evidence of proponent is uncontradicted in the record that the substance of the will of 1933 was dictated by the testator to his attorney, at the latter's office, and taken down by him in the form of a memorandum. From this memorandum the will was dictated, in the presence of Friedrich Bose, to the office stenographer who typed the same. It was thereupon read to the testator in the English language, and he then declared the same to be his will, and in the execution thereof all the statutory formalities were complied with. The same is true with reference to the execution of the codicil. The will and codicil are witnessed by the same persons and their testimony clearly tends to establish the competency of the person executing them.

Further, proponent's evidence, given by witnesses who were actually present and observed the testator on the days mentioned, is that on the day of the execution of the will, July 21, 1933, and the codicil, June 30, 1934, the testator's general health was good. There is also evidence in the record that, generally, during the period of time which included both the execution of the will and the codicil, the following were included in the testator's ordinary activities, viz.: He "split wood with a ten-pound sledge hammer and a wedge, and piled up brush; raked brush and burned

that; fed the chickens; carried water to the hogs; carried wood to the house, and walked around the land," and over the farm where he lives "more or less." It appears that, unaided, the old man ascended 25 or 30 steps of a stairway leading to the lawyer's office on the day the testamentary instrument in suit was drawn, and declined assistance in going to or returning from the same; that his mental condition then was as usual and no change in the same occurred, so far as his mentality was concerned, until 1936 or 1937.

Miss Wendte, the law-office stenographer who was one of the witnesses to both will and codicil, testified, with reference to Friedrich Bose, as follows: "Q. Did you on his various visits there to the office talk with Mr. Bose at different times? A. Yes. Q. You speak German, do you not? A. Not very fluently. Q. Did you talk to him in English or German? A. In English. Q. And he could understand English, could he? * * * A. Yes. Q. Could you understand his English? A. Yes. Q. You had no difficulty conversing with him? A. No, sir. Q. Or in understanding him? A. No, sir. Q. I think I asked you whether his ruggedness for one of his years was noticeable? A. Yes. Q. Was his ruggedness for one of his years noticeable? A. Yes; it was." On cross-examination this same witness testified as follows: "Q. Do you talk high or low German? A. I understand high German. Q. But not low German? A. Not very well. Q. And talk very little high German? A. That is right."

The proof of contestants discloses that Friedrich Bose could speak and understand both high and low German; and it is the claim of their witnesses that, although during the early years of his residence in his adopted country he had acquired sufficient knowledge and use of the English language to carry on the business connected with his blacksmith shop with English speaking people, yet during the 20 years spent in Germany he had wholly lost the faculty or ability of using the language with which at one time he was crudely familiar.

Also, contestants' evidence covered the period after his

return from Germany in 1926, until his death in January, 1937. If we exclude the Lutheran minister, and two unimportant witnesses, it was given exclusively by the contestants and witnesses related to them by blood or marriage. It was sought to establish as a fact that the testator was foolish, weak-minded, and incompetent; that he lacked testamentary capacity and was a sufferer from senile dementia. For this purpose a great mass of testimony appears in the record, of which the following may be deemed typical, viz.:

That he was obsessed with the idea that the "Freemasons killed people" who talked "out of school;" that almost everybody was stealing from him; that at times he could see cattle running about the place, "whole yards of them," when none were actually there; that Alfred Bose was living in the chicken house on the home place, and he saw lights therein long after Alfred Bose had left the farm, and no lights therein actually existed; that he at times heard voices when there were none to be heard; that he failed to recognize his own daughters, and his daughters' husbands, and repeatedly failed to recognize his other relatives and granddaughters; that he was obsessed with the thought that persons were attempting to poison him; that he attempted to kiss two of his granddaughters who were about 15 or 16 years old; that he rubbed his little great grandchildren's chubby faces with his beard and scared them thereby and made them cry; that he presented candy to his grandchildren unsanitarily wrapped in dirty newspapers; that he became very deaf and found it very hard to make himself understood; that he had no realization of values, and lost power to carry on a continued conversation in German, and refused or found it impossible to engage in conversation in the English language; that he dressed in winter garments during the summer season. It is to be noted, however, that Mrs. Thresa Knutzen, one of the contestants, testified, viz.: "My father was not—I don't call him crazy at all. He was childish and weak-minded."

Further, the contestants, to sustain their objections, rely

exclusively on the testimony of lay witnesses, but in whose testimony the time of occurrence of the incidents and conduct testified to are not fixed with any degree of particularity. The weight of this class of evidence is necessarily determined in part by their relation in point of time to the execution of the challenged will and codicil, and in part by the particular acts and conduct of the testator personally observed by the witness upon which his testimony of mental unsoundness is based. *Carter v. Gahagan,* 102 Neb. 404, 167 N. W. 412.

In general, there is no serious attack made upon the testamentary capacity of Friedrich Bose as it existed at the time of his return from Germany in 1926 and for some period thereafter. One of the contestants' witnesses, a grandson, who lived on an adjoining farm, saw the testator frequently and often visited with him during the latter years of this aged patriarch, testifies that before 1930 mentally he was "all right." There appears to be no substantial dispute of this statement in the entire record.

The record contains no sufficient proof to establish undue influence or fraud, as alleged by contestants, and the district court based its conclusion wholly upon testamentary capacity and failure to interpret to testator, in the German language, the will and codicil executed by him.

We quite agree with contestants that "The burden is upon the proponent of a will, both in the county court and in the district court on appeal, to prove, not only the execution of the will, but the capacity of the testator." *Seebrock v. Fedawa,* 30 Neb. 424, 46 N. W. 650. See, also, *Murry v. Hennessey,* 48 Neb. 608, 67 N. W. 470; *In re Estate of Sweeney,* 94 Neb. 834, 144 N. W. 902.

The record in this case establishes beyond question the due formal execution of the will and the codicil in full compliance with the statutory requirements. *Holyoke v. Sipp,* 77 Neb. 394, 109 N. W. 506; *In re Estate of Aden,* 134 Neb. 810, 279 N. W. 794.

At the threshhold of our consideration of the question of testamentary capacity, we are met with the contention of

contestants, in substance, that the testator, at the time of the execution of the will and codicil in suit, was suffering from senile dementia; that in senile dementia there are no lucid intervals, and soundness of mind and testamentary capacity cease to exist. That senile dementia may progress to a degree that would justify this contention is true, but that its mere presence justifies contestants' assumption is not supported by the authorities generally, and besides, in this case, we do not have the assistance of expert testimony on this subject.

As stated in 68 C. J. 442, "Senile dementia, often a result from old age, does not necessarily result in mental incapacity to make a will, but there must be such a failure of mind as will deprive the testator of intelligent action. The disease is progressive in nature, and it must be determined whether its progress has so impaired the faculties of the testator that they fall below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effect in the particular case."

On the other hand, the authorities generally sustain this conclusion, viz.: "A person possessing the requisites of testamentary capacity is not incapacitated from making a will by old age, although his advanced years be accompanied by infirmity of mind and body. Nor is he incapacitated by failing memory, vacillating judgment, childishness, slovenliness in dress, eccentricities or peculiarities in habit or speech, and even delusions or hallucinations if they do not affect the execution of the will, and he is not limited to conventional methods of disposition." 68 C. J. 440.

We appear committed to the view that, when the testamentary capacity of a testator is challenged on grounds of alleged senile dementia, this fact shall be determined according to the rules applicable to other forms of insanity. *In re Estate of Winch*, 84 Neb. 251, 121 N. W. 116. See, also, *Stull v. Stull*, 1 Neb. (Unof.) 389, 96 N. W. 196. The accepted view is, viz.: "The mental capacity of a testator is tested by the state of his mind at the time he executed his

will." *In re Estate of Laflin,* 108 Neb. 298, 187 N. W. 885.

In the instant case, the application of this test to testator's condition as it existed on the 21st day of July, 1933, when he made his will, and on the 30th day of June, 1934, when he executed the codicil thereto, is decided by ascertaining whether Friedrich Bose then and there understood the nature of the act, the extent of his property, the proposed disposition of it, and the natural objects of his bounty. The result of that test necessarily determines the validity of these testamentary instruments in suit, so far as concerns questions of mental capacity. *In re Estate of Kajewski,* 134 Neb. 485, 279 N. W. 185; *In re Estate of Frazier,* 131 Neb. 61, 267 N. W. 181; *In re Estate of Ayer,* 114 Neb. 849, 211 N. W. 205; *In re Estate of Nelson,* 75 Neb. 298, 106 N. W. 326; *In re Estate of Kerr,* 117 Neb. 630, 222 N. W. 63.

It is to be remembered that, in respect to capacity to make a will, it is not medical soundness of mind that governs, but testamentary capacity as defined in law, and a high degree of mentality is not required. *In re Estate of Frazier,* 131 Neb. 61, 267 N. W. 181.

Conceding that at times the testator in the instant case was subject to delusions, it must be granted under the authorities cited above that this was insufficient to destroy testamentary capacity, unless "such delusions controlled his action and rendered him insensible to the ties of blood and kindred." *In re Estate of Kerr,* 117 Neb. 630, 222 N. W. 63. If the testator was of (legally) sound and disposing mind and memory, and acted voluntarily, at the time he executed the will in controversy, it is immaterial what the condition of his mind was before and after that time. *In re Estate of Jensen,* 185 Minn. 284, 240 N. W. 656.

In determining the question of whether at the time of the execution of the testamentary instruments in suit the testator was of sound mind and had sufficient capacity to make a will, we may consider the terms and provisions of the will itself, whether same are just or unjust and reasonable or unreasonable, in connection with contemporaneous

circumstances and conditions, and the history of the events leading up to the execution thereof. *In re Estate of Gunderman,* 102 Neb. 590, 168 N. W. 359; *In re Estate of Kerr,* 117 Neb. 630, 636, 222 N. W. 63; *In re Estate of Alexander,* 128 Neb. 334, 258 N. W. 655.

So, too, prior wills executed, as to which there are no substantial claims of testamentary incapacity, in a similar manner may likewise be considered. *Seebrock v. Fedawa,* 30 Neb. 424, 46 N. W. 650; *Blochowitz v. Blochowitz,* 122 Neb. 385, 240 N. W. 586.

From the witnesses vouched for by the contestants, we find (as hereinbefore set out at length) that in 1927 the testator, accompanied by the then minister of the German Lutheran Church, of which he was a member, and by his son-in-law, both of whom were Germans and versed in their native tongue, proceeded to the office of C. A. Kingsbury, an attorney, to secure the preparation of his will. The testator's desires and intentions were communicated to the attorney by aid of the interpretations of his accompanying friends. From the directions so communicated, the will was drafted by the attorney, and then carefully read over by the scrivener to the testator and his accompanying friends. The testator received assurance in the German language that the will as written conformed to his intentions, and then duly executed and published the same. The substance of this will of 1927, heretofore set out in this opinion, will not be here repeated. The fundamental plan on which the will of 1927 was based was clear and distinct. To the eldest son, Fredrick Bose, was given the home place increased to 180 acres of land, subject to a charge of $4,000. To John Bose was given 140 acres of land and certain buildings, subject to a charge of $3,000. The two sons were to pay to their remaining brothers and sisters the sum of $7,000, which was made a charge against their respective devises, to which sum $1,000 received previously by the son Charles Bose from the father was to be added, thus giving to each child the sum of $2,000 as a legacy from their father's estate.

It is obvious that Fredrick Bose and John Bose were the favored children by the terms of the will of 1927. Fredrick received more in proportion than did John. However, the matter of the relative claims of his children to their father's bounty was a matter strictly for the father's determination. The competency of the father at the time of making this will in 1927 is substantially unchallenged. It had been carefully explained to him in his own language and he knew the will he executed. It clearly evidenced his lawful intent.

On July 21, 1933, Friedrich Bose again repairs to the law office of C. A. Kingsbury, who had drawn the will of 1927 for him, and alone, personally and unaided, secured the drafting of the will of 1933. The clear weight of all the evidence is that this was done on his own initiative. There is no affirmative evidence in the record that it was done upon the advice, solicitation or prompting of any one but himself. The new will again expressed his intention that his favorite son, Fredrick Bose, should receive the "home farm" of 180 acres, which the testator at all times planned this son should receive. But the 140 acres of land, which by the will of 1927 had been devised to John Bose, his favored son, was now equally divided among his five children, exclusive of Fredrick Bose, and all lands devised were relieved from the payment of definite amounts as prescribed in the will of 1927. In addition, contemporaneously with the execution and publication of the will of 1933, the testator had prepared a deed of general warranty, containing the usual covenants of warranty, and which he duly executed, and which for a recited consideration "of the sum of One Dollar, Love and Affection, and other valuable consideration, in hand paid," purported to convey unto "Fred Bose" the 180 acres of land devised to the latter by the terms of the will of 1927. This warranty deed, the uncontradicted evidence in the record establishes, was by the grantor publicly and unconditionally delivered to the grantee named therein, subsequent to the execution and the due publication of the will of 1933. The validity of these instru-

ments and the mental capacity of the maker to execute the same, we must now determine from all the evidence in the record, including the consideration, the terms and provisions of the instruments themselves as to whether just or unjust, reasonable or unreasonable, in connection with the contemporaneous circumstances and conditions and the history of the events leading up to the execution thereof. Certain contemporaneous circumstances and conditions as they existed generally on the 21st day of July, 1933, are matters of which courts take judicial notice. *Blaisdell v. Home Bldg. & Loan Ass'n,* 189 Minn. 422, 249 N. W. 334; *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; Laws 1933, ch. 65; Laws 1933, ch. 78; Laws 1933, ch. 17; *First Trust Co. v. Smith,* 134 Neb. 84, 277 N. W. 762.

We are thus justified in taking judicial notice of the then existence of a world-wide business and commercial crisis which had attained such proportions as to substantially interrupt and effectually destroy the ordinary and usual course of business and finance. On the preceding March 4, 1933, all banks throughout the nation had been closed pursuant to executive order. By act of congress of May 12, 1933, devaluation of our national currency had been authorized to the extent of not more than 50 per cent. and not less than 40 per cent., the exact percentage determinable by presidential proclamation. Legislative moratoria had been provided not only throughout the nation, but also in Nebraska. The emergencies growing out of the then economic crisis, world-wide in scope, were such as particularly affected "the value of all commodities produced in Nebraska, and thereby causing a collapse in the value of all real estate in the state of Nebraska." Laws 1933, ch. 65, sec. 5.

It is obvious that under these new developments the plan adopted by the testator, pursuant to which the will of 1927 was drawn, necessarily no longer expressed the testator's intentions. Under conditions prevailing during the Spring and Summer of 1933, the provisions of the will of 1927

had become not only uncertain in their application, in so far as to secure the result intended by the testator when framed by him, but potentially dangerous to all concerned. The values of the land out of which the legacies were payable had utterly collapsed; the value of the medium of exchange in which the legacies were defined had been at least potentially devalued not more than 50 per cent., nor less than 40 per cent. by congressional enactment. One of his favorite sons, John, had departed this life. Under these conditions the new will of 1933 was drawn and the warranty deed executed. It is to be noted that in the new provisions for the distribution of his estate, contained in the will of 1933, the plan of ultimate division of his property, as evidenced by the will of 1927, was substantially retained, modified only by the death of his son John, and the necessary changes which the presence of an existing commercial, business and farm crisis compelled. Fredrick Bose received the "home place," the 180-acre farm, which the facts of the situation indicate was at all times intended for him. In lieu of monetary legacies, the other children (and their representatives where the immediate children had departed this life) received undivided shares in the 140-acre farm. The reason for the preference intended for his son John vanished with the death of the latter. This modification of the original plan secured to the intended recipients of his bounty a certainty of division of the corpus of this estate, wholly unattainable where such a division depended on the changing values of a medium of exchange and the then undeterminable values of real estate, and rendered certain the proportionate part of the real estate each devisee should receive. Indeed, the will of 1927, and the will and deed of 1933, are so related as to render applicable the principle announced by this court in *Blochowitz v. Blochowitz,* 122 Neb. 385, 240 N. W. 586, in the following language, viz.:

"A prior will, executed when the testator's testamentary or mental capacity was and is unquestioned, and as to which the existence of undue influence is not charged, and which conforms substantially as to results produced to the

instrument contested, may be considered as competent evidence for the purpose of refuting charges of undue influence or want of testamentary or mental capacity by showing that the testator (and grantor) had a constant and abiding scheme for the distribution of his property."

The fact that this old man, who certain witnesses in this case regard as incompetent, had accumulated, by his own efforts, a competence, and, notwithstanding he was compelled to pass through the panics of 1873, 1893, 1906, and 1933, was enabled to conserve it until he had attained more than 96 years, and then was enabled to divide between his children, in 1933, a half section of Nebraska land of good quality, and wholly unencumbered, in such a manner that each of his beneficiaries secured the exact portion he intended for him, definite and certain notwithstanding the surrounding conditions, is a fact that challenges our attention as persuasive evidence of his then mental competency, and leads to our conclusion that in the management of his business affairs, including the making of the last disposition of his estate, he was uncontrolled and uninfluenced by insane delusions, if such he ever had. Certainly the evidence in the record as an entirety, in the light of the surrounding circumstances, would be ample to sustain a verdict for the proponent of this will, so far as affects the questions of testamentary capacity on the part of the testator and alleged undue influence exercised upon him.

We quite agree that it is essential to the validity of a will that the testator know and understand the contents thereof. The knowledge must be possessed at the time of its execution. In the instant case, the proof is without contradiction that Friedrich Bose on July 21, 1933, personally gave his directions to his attorney who in his presence reduced them to a memorandum. The attorney then in the presence of the testator dictated the terms of the will and the warranty deed to a stenographer. The stenographer in turn typed the instruments. The will and deed were then again read over to the testator, in the English language, and both duly executed by him. There is no affirmative

evidence of mistake in this transaction; there is not a suspicion of fraud. The requirement that testator must know and understand the contents of the will does not mean that the testator must be able to correctly interpret the will in a legal sense. It has been held not to be essential to the validity of a will that the testator should understand the meaning of all the technical terms and legal phraseology therein employed; that it is sufficient that he understands the meaning and effect of the instrument as a whole, if the same truly expressed his testamentary intention as to the disposition of his estate.

"It is not necessary that he should view his will with the eye of a lawyer and comprehend its provisions in their legal form. It is sufficient if he has such a mind and memory as will enable him to understand the elements of which it is composed, and the disposition of his property in its simple forms." *Banks v. Goodfellow*, 22 Law Times Rep. n. s. (Eng.) 813.

In Nebraska there is no statutory requirement that a will be read to the testator or to the witnesses thereto prior to its execution. It is sufficient if the court is satisfied by competent evidence that the contents of the will were known to and approved by him. Where a will, written in the presence of the testator according to his dictation, is executed according to the statute, it is valid though not read to or by him. *Hess' Appeal*, 43 Pa. St. 73, 82 Am. Dec. 551.

The doctrine as stated by the English cases on this point is illuminating, viz.:

"If a person has given instructions to a solicitor to make a will, and the solicitor prepares it in accordance with those instructions, all that is necessary to make it a good will, if executed by the testator, is that he should be able to think thus far, 'I gave my solicitor instructions to prepare a will making a certain disposition of my property. I have no doubt that he has given effect to my intention, and I accept the document which is put before me as carrying it out.'" *Parker v. Felgate* (1882-1883) 8 Prob. Div. L. R. (Eng.) 171. This doctrine was expressly approved in *Perera v. Perera* (1901) App. Cas. (Eng.) 354.

And the supreme court of Pennsylvania has made this observation: "When the testator trusts his scrivener, why should we distrust him, when there is no word or act that impeaches his honesty?" *Hess' Appeal,* 43 Pa. St. 73, 82 Am. Dec. 551.

Then, too, in the instant case, the will of 1933 was but a modification of the will of 1927, the contents of which latter will were fully made known to Friedrich Bose. *In re Mather's Will,* 76 Vt. 209, 56 Atl. 982.

It follows, therefore, that, in view of the facts and circumstances surrounding the execution of the will of 1933, the failure to read the will to the testator in translation in no manner affects its validity. This conclusion is equally applicable to the codicil executed the following year.

The last question for consideration is the action of the trial court in sustaining the motion of the contestants, made after plaintiff's evidence in chief had been received and after the evidence adduced by the contestants had been concluded, for a directed verdict in their favor, and denying the application of the proponent for permission to introduce further evidence in support of his petition, and thereupon entering a judgment in favor of the contestants.

The record contains the following facts pertinent to our present consideration, viz.: Plaintiff presented certain evidence as his case in chief. At the close of same, as the last line thereof, appears the following, made in open court, viz.: "Mr. Kingsbury: Plaintiff rests, reserving right to call" The sentence was not completed in the transcript of the reporter's notes; the usual punctuation terminating the sentence is omitted. Nevertheless, the statement, so far as set forth in the bill of exceptions, though incomplete, must receive a reasonable construction, and be given its natural import and meaning. It amounts to a "rest with reservations." A careful consideration of the bill of exceptions as an entirety discloses no waiver of the reservation thus indicated. It remained thereafter throughout the trial a "conditional rest."

At the close of contestants' evidence, on January 27,

1938, and after they had formally rested, the proponent presented an oral motion containing four paragraphs. The first paragraph of this motion was wholly directed to securing the withdrawal of paragraph 3 of the will in suit from further consideration by the jury. This paragraph 3 of this will contained the bequest of the 180-acre farm to Fredrick Bose and nothing else. The motion of proponent was based upon the fact that the uncontradicted evidence of the record disclosed that, after the will of 1933 had been executed and published, the testator had conveyed the premises devised to his son Fredrick Bose by deed of general warranty. The remaining three paragraphs of this oral motion sought a directed verdict in behalf of proponent.

It will be remembered that under the issues in this case, and the evidence, the devises contained in this will, being separate, distinct, and wholly unrelated, were therefore to be considered as severable. *In re Estate of Koller,* 116 Neb. 764, 219 N. W. 4; *In re Estate of Mooney,* 131 Neb. 52, 267 N. W. 196.

Also, "In any event, a conveyance by the testator, subsequent to the execution of his will, of property devised therein, may, in a proper case, operate in effect as a revocation of the will to the extent of the property conveyed." 68 C. J. 843. See, also, *Baacke v. Baacke,* 50 Neb. 18, 69 N. W. 303.

This oral motion of proponent was argued by the parties and by the court taken under advisement on January 27, 1938. On January 28, 1938, after court had reconvened, the contestants filed and presented a written motion for a directed verdict, in four paragraphs, which we may briefly summarize as based upon the insufficiency of the evidence to sustain the proponent's contention. There was argument upon contestants' motion, at the close of which the court announced: "The motion of the contestants is sustained." The bill of exceptions further recites, viz.: Mr. Kingsbury: "Comes now the proponent and his attorney, and at this time before the ruling of the court on motion of proponent for a directed verdict, does withdraw said motion and

each part thereof consisting of paragraphs one, two, three and four, and all parts of said motion," and leave to offer further evidence was then requested. "Court: The motion will have to be overruled. It comes after the ruling of the court."

On this record the contestants contend that in a civil jury trial, when both sides move the court to instruct a verdict in their behalf, neither party can predicate error on the court's action in failing to submit the case to the jury. Conceding that the principle thus contended for is correct in a proper case, is such a case presented in the instant record? Our constitutional provision is, viz.: "The right of trial by jury shall remain inviolate." Const. art. I, sec. 6. In the instant case, to sustain the action of the trial court both parties must either expressly or by necessary implication have waived the benefits of this provision. In the case of *Knies v. Lang*, 116 Neb. 387, 217 N. W. 615, cited by appellees, the defendant having made a motion for an instructed verdict in his behalf, plaintiff formally joined with him and asked the court to direct the jury to return a verdict for the same reason in favor of plaintiff. Thus, the waiver was expressly made. In *Adler v. Royal Neighbors of America*, 90 Neb. 56, 132 N. W. 716, and *Segear v. Westcott*, 83 Neb. 515, 120 N. W. 170, also cited by the appellees, the motions of the respective parties as passed upon by the court were coexistent and conterminous, and made without reservation, and thus by necessary implication clearly evidenced the intent to waive the constitutional benefits. Under the practice that prevails in this jurisdiction, a request by both parties for direction of a verdict amounts to a waiver of a jury, and submission of the whole case to the court, if there is not other action on the part of one or both parties inconsistent with the theory of waiver.

In the case of *Adams v. City of Omaha*, 119 Neb. 753, 230 N. W. 680, this court, in effect, determined that motions for a directed verdict must be made without reservation. Judge Good, in the *Adams* case, in discussing the situation that there prevailed, says, in part, viz.:

"In the instant case, each party moved for a directed verdict without any reservation, and thereby each party invited the court to discharge the jury and decide the case upon the record then made. Not until after the court had discharged the jury and indicated that its holding would be for the plaintiff did the defendant make a request to introduce evidence. It was then too late for it to demand this as a matter of right."

In the instant case the particular and definite language of the first paragraph of proponent's motion, in effect, was not for a favorable judgment as to the third paragraph of the decedent's will, but sought to remove paragraph 3 from further consideration for any purpose. The terms of the motion presented by proponent contained no express waiver of the reservation originally stipulated for when proponent rested at the close of the evidence in chief. In addition, the jury had not been discharged when application to submit further evidence was made by the proponent. Under the circumstances of this case, as disclosed by the record before us, it cannot be said that the motions passed upon by the trial court were coexistent and conterminous, and made by both parties without reservation. The record as an entirety fairly presents a question to be determined by a jury and also discloses that the constitutional right of jury trial had not been waived either expressly or by necessary implication by the proponent.

It follows that the district court erred both in sustaining the contestants' motion for a directed verdict, and in denying the proponent the right to introduce further evidence.

The judgment of the trial court is, therefore, reversed and the cause remanded for further proceedings in harmony with this opinion.

REVERSED.