MYRTLE M. JOHNSON, ADMINISTRATRIX, APPELLEE, V. ANOKA-BUTTE LUMBER COMPANY ET AL., APPELLANTS.

5 N. W. (2d) 114

FILED JULY 24, 1942.   No. 31403.

*Gaines, McLaughlin & Shoemaker*, for appellants.

*William H. Lamme, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and YEAGER, JJ., and ELLIS, district Judge.

CARTER, J.

This is an action brought by plaintiff as administratrix of the estate of Carl H. Johnson, deceased, against the defendants to recover damages for the death of Carl H. Johnson. A verdict for $10,000 was returned for plaintiff and defendants appeal from the judgment entered thereon.

It appears that on the night of April 9, 1941, Carl H. Johnson was killed when struck by an oil transport truck

owned by the Anoka-Butte Lumber Company and operated by its employee, Celestine Reiman. The accident occurred south of a viaduct on highway No. 275 near the town of Waterloo, Nebraska, at about 10:00 p. m. The record shows that, as one approaches the viaduct from the south, the highway runs practically straight north until it reaches a point 150 feet south of the steel structure constituting the viaduct proper as distinguished from its approaches. When this point is reached the highway curves slightly to the west. The deceased was walking south on the left-hand side of the highway at a point 786 feet south of the south end of the steel portion of the viaduct when he was struck by the oil transport, which was also traveling south.

There is very little conflict in the evidence. The defendant Reiman left Fremont with the empty oil transport shortly after 9:00 p. m., en route to Topeka, Kansas. The night was dark and cloudy. The pavement was dry, but the shoulders were wet due to a rain that fell during the day. He had not been driving during the day, prior to his taking over the operation of the oil transport at Fremont. His testimony is that his truck, including brakes and lights, was operating properly. As he approached the viaduct from a northerly direction he passed a loaded cattle truck being driven by Reynold Ditter, which followed him up the incline of the approach to the viaduct at a distance of 250 feet behind him. As the oil transport came up the approach to the viaduct it followed another cattle truck being operated by John Nansel. As the Nansel truck left the steel portion of the viaduct the oil transport started around him. The evidence is that Nansel was not driving over 30 miles an hour and that Reiman was not exceeding 35 miles an hour during the passing operation. The paving at this point was 18 feet wide and the highway had a gradual downgrade for some distance. Just as the oil transport cleared the Nansel truck at a point approximately 786 feet south of the steel part of the viaduct, it was turned suddenly to the right, causing Nansel some difficulty in avoiding a collision. Reiman almost lost control of the transport, it running down

the right shoulder of the highway and coming to a stop off the highway almost perpendicular to it at a point 147 feet south of the place where the body of the deceased lay on the pavement. The evidence of Reiman is to the effect that just as he cleared the Nansel truck he suddenly observed the deceased on the pavement only four to six feet ahead of him and that he turned the transport to the right in an attempt to avoid the accident. The evidence shows that the truck proper missed the deceased, but that he was struck by the front end of the tank of the transport. The evidence of both Nansel and Reiman is that the highway was straight, that the lights on their trucks were on and that each could see the pavement within the full range of his lights. The witness Nansel never saw the deceased until after he was struck. The body of the deceased was found crosswise on the pavement with the head to the east within a few inches of the curb.

Before passing the Nansel cattle truck, Reiman blinked his lights as a signal that he was going to pass. Nansel observed the signal and the fact that the lights on the transport were on. Reiman did not sound his horn or give any other audible signal of his intention to pass.

The witness Roessler, a surveyor, testifies that the highway south from the viaduct forms a vertical curve, making a gradual grade. He also testified that there is a lateral curve requiring a super elevation of the pavement on the left-hand side for a distance of 310 feet.

The witness Ditter, the driver of the first cattle truck, testifies that when he was on the viaduct proper, Nansel was beyond it. His evidence is to the effect that the transport was also over the viaduct when he saw the lights on the transport blinked and the transport then start around the Nansel truck at a point 200 feet south of the steel section of the viaduct.

Defendant Reiman testifies that when he saw the deceased first he was walking about two feet from the east or left-hand side of the pavement. Deceased did not turn his head and evidently did not hear the approach of the vehicles behind him.

On this evidence the jury returned a verdict for plaintiff in the amount of $10,000. Defendants urge that the evidence is insufficient to sustain a verdict and that defendants' motion for a directed verdict should have been granted, that the court erred in the giving of instructions and that the judgment is excessive.

It is urged that the oil transport was negligently operated on the left-hand side of the highway while on a curve, said alleged operation being contrary to statute. Comp. St. Supp. 1941, sec. 39-11,103. The testimony is somewhat in conflict as to the point where the oil transport started to pass the Nansel cattle truck. The evidence most favorable to plaintiff is that the start was made on the viaduct proper. The undisputed evidence is, however, that deceased was struck 786 feet south of the viaduct and that from a point 310 feet south of the viaduct the road was straight. For 476 feet, therefore, before striking the deceased, the oil transport had been traveling on a straight road. Any violation of the rules of the road back on the overpass, therefore, had no causal connection with the accident. We think this evidence is too remote to have any force in establishing negligence on the part of the operator of the oil transport. We are of the opinion that the trial court was in error in submitting this issue to the jury when there was no evidence offered sufficient to sustain a finding of negligence for passing another truck on a curve. Such error is prejudicial to the rights of the defendants. *Knoche v. Pease Grain & Seed Co.,* 134 Neb. 130, 277 N. W. 798; *McClelland v. Interstate Transit Lines,* 139 Neb. 146, 296 N. W. 757.

It is contended by plaintiff that the operator of the oil transport drove at an excessive speed and that he was unable to stop within the range of his vision. There is no evidence to sustain this conclusion in the record. The maximum rate of speed of the oil transport testified to by any witness was 35 miles an hour. This certainly was not excessive speed on a straight, arterial state highway outside the territorial limits of any village, town or city, under the circumstances shown. Reiman had no reason to attempt a stop

within the range of his vision. The first time he saw the deceased he was from four to six feet from him. The situation does not call the rule cited into operation. As a general rule it is negligence as a matter of law for a motorist to drive an automobile so fast on a highway that he cannot stop in time to avoid a collision with an object within the area lighted by his lamps. *Roth v. Blomquist,* 117 Neb. 444, 220 N. W. 572. But this rule has no application where the object struck was not seen until the driver was close upon it. The rule that it is negligence to drive a car so fast that you cannot stop it within the distance you can see is based upon the reckless speed that such a situation implies. In the case at bar an ability to stop within the range of the oil transport's lights would not have averted the accident. The evidence indicates that the transport was being driven at a reasonable rate of speed. The rule contended for, although correct, has no application to the facts before us. The negligence of Reiman must, if any exists, be predicated on some other theory.

It is argued, however, that the operator ought to have seen the deceased on the highway in ample time to have averted the accident. This raises a different question than that last before considered. It cannot be questioned that deceased had a legal right to walk along the highway on the pavement. The transport likewise had a right to travel the highway at the speed it was traveling and to pass other cars or trucks at the point where it passed the Nansel stock truck. The deceased, though he had a legal right to walk on the highway, is also required to use reasonable care for his own safety. The driver of the transport, in the exercise of his legal rights, was required to exercise due care for the safety of others who might reasonably be expected to be on the highway. Such driver is likewise required to anticipate that pedestrians may be using the highway and to use due care to protect any such which may be using it at the time. *Holler v. Lowery,* 175 Md. 149, 200 Atl. 353; *Poole v. Twentieth Century Operating Co.,* 121 N. J. Law, 244, 1 Atl. (2d) 389.

In passing, the driver of the oil transport did not sound his horn nor make any audible warning of his approach. It

is true that he blinked his lights, a custom often used but unrecognized by the rules of the road, to indicate his intention to pass. The driver of the stock truck recognized the signal and gave effect to it. But there is, of course, no evidence that the deceased saw or understood such a signal.

It is claimed that the lights on the oil transport were defective and the jury were instructed with reference thereto. The proof offered was the evidence of Alfred Pattavina, who tested the lights and brakes at Omaha on the day following the accident. His testimony was that the bright beam of the left headlight was out. The evidence of Reiman, Ditter and Nansel was that the lights were properly operating at the time of the accident and after. Two deputy sheriffs investigated the accident immediately after it occurred, and neither observed that a headlight was out. A picture taken by a deputy sheriff during the investigation shows the oil transport in the background with both lights burning. The testimony of Pattavina as to the condition of the lights was too remote and without sufficient foundation to have any evidentiary value. There was no evidence sufficient to warrant the submission of the question of defective headlights to the jury, and it was error for the court to so do.

The evidence shows that deceased was wearing a blue suit and a dark overcoat. That a pedestrian so dressed would be more difficult to see goes without saying. The operator of a truck equipped with headlights as required by statute, who does not observe a pedestrian until just before striking him, is not conclusively guilty of negligence. Under such circumstances it is clearly a question for the jury. The question whether Reiman should have seen the deceased, and the inferences to be drawn from the evidence adduced, are matters of evidence which a jury must decide.

In *Schmeiske v. Laubin,* 109 Conn. 206, 145 Atl. 890, the court in a similar case said: "It is a matter of common knowledge that a pedestrian, clad in dark clothing, upon the background of a dark road, and walking in the same direction in which an automobile is proceeding which is overtaking him from the rear, will not under all circumstances be

picked up by the headlights of a car at a distance of two hundred feet. In the present case it was not alleged or claimed by the plaintiff that there was any violation by the defendant of the statute requiring a motor vehicle to be equipped with headlights throwing sufficient light ahead to show an object upon the roadway two hundred feet distant. On the contrary, the plaintiff offered evidence to prove and claimed to have proved that the defendant's car was equipped with proper headlights in compliance with the statute, and contended that, the car being thus equipped, its driver was negligent as a matter of law in failing to see plaintiff's intestate in time to avoid striking him. Because a dark object, resting upon a dark background, may not be clearly visible under all conditions at a distance of two hundred feet in front of a motor vehicle equipped with headlights which meet the statutory requirements, the failure of the operator of such a vehicle to see such object at that distance may not conclusively establish a lack of due care on his part. The court did not err in submitting to the jury the question of the negligence of the operator of the defendant's car."

And in *Booth v. Meagher*, 224 Mass. 472, 113 N. E. 367, the court said: "Whether the principal defendant was negligent in not sooner seeing the plaintiff and in not so operating his automobile with reference to the concurrent right of the plaintiff and himself to travel upon the public way as to avoid a collision, was for the jury."

Defendants contend that the question of the contributory negligence of the deceased should have been submitted to the jury. It must be borne in mind that the deceased had a right to walk down the paved portion of the highway that was equal to that of the oil transport. Deceased was walking on the left-hand side of the pavement, facing the direction in which traffic occupying that side of the highway usually approached. This is recognized as the safest method for a pedestrian to travel longitudinally on a public highway. He had the right to assume that vehicles approaching from the rear would exercise ordinary care in keeping a lookout for him. He was under no duty to maintain a lookout to the

rear to avoid a charge of negligence. *Brenning v. Remington,* 136 Neb. 883, 287 N. W. 776; *Nichols v. Havlat,* 140 Neb. 723, 1 N. W. (2d) 829. We do not think that the evidence shows any act of the deceased which would warrant the submission of contributory negligence to the jury. The trial court properly refused to do so.

The only question properly determinable was whether Reiman was negligent in failing to see the deceased in time to avoid the accident.

This court has often pointed out that it is error to submit issues upon which there is no evidence to sustain an affirmative finding. It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. The submission of issues upon which the evidence is insufficient to sustain an affirmative finding is generally very prejudicial and invariably results in a second trial. It is for this reason that this court discourages the copying of pleadings in the instructions, for they ofttimes contain allegations which have been abandoned or which have become nugatory for want of sufficient proof to sustain them.

For the reasons stated, the judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED.