IN RE ESTATE OF ADDIE FARR, DECEASED. FERN ALLEN ET AL., APPELLEES, V. CLIFFORD D. FARR, EXECUTOR, APPELLANT.

33 N. W. 2d 454

Filed July 16, 1948. No. 32438.

*Arthur A. Weber* and *Wells, Martin & Lane,* for appellant.

*G. A. Farman, Jr.,* and *Julius D. Cronin,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

PAINE, J.

This is an appeal from a judgment of the district court for Rock County entered on the verdict of a jury deny-

ing probate of the last will of Addie Farr, deceased. The principal ground of the contest was that it was procured by the undue influence of her son Clifford. The principal question before this court is whether there is sufficient evidence to sustain the verdict of the jury.

Addie Farr, of Newport, Rock County, executed her last will October 30, 1945. She died January 2, 1947, at the age of 81 years. This will gave to her son W. E. Farr, $5; to Elmo Keller, a grandson, $5; to Clesson Keller, a grandson, $5; to a granddaughter, Thelma Holiday, $100; to her son Roy M. Farr the southwest quarter of Section 4, Township 30, Range 17, in Rock County; to her son Clifford D. Farr she gave all the rest of her estate, both real and personal, in the residuary clause, subject only to the provision that Clifford D. Farr should pay to her daughter, Fern Allen, the sum of $1,000 in cash within six months from the date of her death.

Clifford D. Farr, as executor, filed a petition in the county court of Rock County and offered the will for probate. W. E. Farr, a son, and Fern Allen, a daughter, filed objections to the probate, assigning four grounds: (1) That the will was not executed according to law; (2) that the will was not properly attested; (3) that the purported will was not the last will of the deceased; and (4) that the will was procured by undue influence of Clifford D. Farr. The reply was a general denial.

After trial in the county court, the will was admitted to probate. Contestants appealed to the district court, and by stipulation of the parties the case was tried there on the same pleadings which were filed in the county court. Trial was had to a jury in the district court. The proponent called the county judge, W. Harold Allen, the county superintendent, Glen Estes, and the county attorney, Arthur A. Weber, who drew the will in his office in the courthouse in Bassett, Estes and Weber being the attesting witnesses to the will,

and the proponent, having thus made a prima facie case, rested.

The two contestants each testified at length, as well as Roy M. Farr, a son, and Lewis C. Woodcock, who had been employed for about 20 years on the ranches of Farr Brothers. Thereupon, the contestants rested and the jury were excused. The proponent, reserving the right to introduce further evidence if the motion was overruled, moved that the jury be dismissed and the court enter an order directing that exhibit No. 1 be admitted to probate as the last will of Addie Farr, deceased, for the reasons: (1) That the evidence conclusively showed that the instrument was executed in the manner and form required by law; (2) that the evidence conclusively established that Addie Farr had the required testamentary capacity to execute said will; and (3) that the contestants had wholly failed to sustain the burden of proof to show that the will was the result of undue influence exercised by Clifford Farr or any other person, and that to submit the case to the jury would be to allow the jury to speculate without any substantial evidence upon which their verdict could be based.

The contestants objected to this motion, the same was argued to the court, and the motion of the proponent was overruled. The jury were called into court, and the proponent then called six witnesses in rebuttal.

The proponent offered eight instructions, all of which were refused by the court. The contestants offered eight instructions, all of which were refused by the court. In instruction No. 7 the court told the jury that the execution and attestation of the purported will had been established by the evidence; in instruction No. 8 he instructed the jury that the testatrix possessed sufficient mental capacity to make a will at the time the instrument was executed by her; and in instruction No. 9 the court told the jury that but one question was submitted for their consideration, which was whether or

not Addie Farr was unduly influenced to make the will, exhibit No. 1..

The case was submitted to the jury and eleven members signed the verdict, to the effect that proponent's exhibit No. 1 was not the will of Addie Farr and should be denied admission to probate. Motion for new trial was overruled, and supersedeas bond was given in the sum of $500.

The proponent assigned as error the overruling of his motion for a directed verdict at the close of the contestants' evidence, and again at the close of all the evidence, and the overruling of proponent's motion to vacate the verdict of the jury and enter judgment in favor of proponent. He assigned as error the refusal to give instructions Nos. 1, 7 and 8 requested by the proponent. He assigned as error the giving of the court's instructions Nos. 10, 11, 12 and 14½. He assigned as error that the verdict of the jury and the judgment entered thereon are not sustained by the evidence and are contrary to law and the evidence.

As the proponent does not assign error to the giving of instructions Nos. 7 and 8, and the contestants have not taken a cross-appeal, it will be accepted as established in this opinion that the will was properly executed and attested, and that the testatrix had sufficient mental capacity to make a will at the time she executed the instrument.

This leaves for our consideration but one question: Was the will of Addie Farr executed through undue influence practiced upon her by her son Clifford D. Farr?

It is necessary to set out facts to show the family relationships and circumstances which led the mother to make the will in question.

William E. Farr, the father, was a very energetic and successful rancher, and with his young wife moved to and lived on what is known as the south ranch in Rock County from about 1882 until about 1914, when he

bought a general store in Newport and moved into that town. While running that store he still conducted and extended his ranching operations by buying additional ranch lands, which became the nucleus of the north ranch.

The father died on Christmas day in 1916. He had extended his operations too far, so that when his untimely death occurred his estate was insolvent. He left his widow, the testatrix, and five children, Clifford D. Farr, the proponent, Fern Allen and W. E. (Gene) Farr, who are the contestants, and Roy M. Farr and Gertrude Keller.

Under the father's will, his widow was given the house in Newport, and an undivided one-third of the south ranch, and one-third of all personal property. The three sons were given the remaining two-thirds of the south ranch and the two-thirds of the personal property, and over 1,100 acres making up the then north ranch. The sons were required by the will to pay off the indebtedness on both ranches, and if they failed the land was all to go to the widow. The two daughters were given bequests of $3,000 each, to be paid after all the mortgages were paid off, and finally they released their liens against the land so new loans could be secured.

Clifford, as executor of his father's estate, filed an inventory, exhibit No. 6, listing real estate of 2,240 acres at $102,244, which included the house in town at $3,000; personal property, $25,875, of which the value of the stock of merchandise in the store was given at $11,250; the balance being livestock and machinery on the ranches.

The debts, claims and mortgages against the father's estate amounted to some $68,560, and that leaves a net estate of $60,559, yet it appears that the inventory values on the land were placed higher than the property could be sold for in order to assist in securing new loans on the property, and if the property of the estate had been

put up at forced sale at that time doubtless the estate would not have paid out.

The shape in which the father left the titles compelled the three sons and the mother to operate the whole property on a partnership basis. Clifford as executor kept all the bank accounts, ran the store in town, and lived with the mother.

The brother Roy insisted upon withdrawing from the partnership in 1927 because he could not get along with Clifford and Gene. They thought he was not doing things right, and so he withdrew. They made a settlement with him and deeded him some property, and after that he never had anything to do with the partnership. He was friendly with his mother and would go and talk matters over with her, but not partnership matters after he withdrew in 1927, and he had little to do with his brothers.

After Roy withdrew from the partnership the mother, Gene, and Clifford continued the partnership and increased the size of their ranches by buying more land. In July of 1945 Gene insisted to his mother and Clifford that he was through, and demanded a division of all partnership assets. He insisted that they divide the bank account right then. The next morning they went to Atkinson. Each brother took out one-half of the money in the bank and put it in his own account.

In July 1945, when this crisis was reached, haying time was just on, they had to continue to put up the hay, and the mother, in that summer of 1945, as she had in seasons before, went out to help cook for the haying hands at her advanced age.

It was not possible for the three members of the partnership to reach an amicable division of the ranch properties. Gene made out a list of the properties constituting the north ranch, and also the south ranch, with the mortgages against each. It appears, from reading the evidence, that Clifford thought that the net value of the two ranches was about the same. Gene

insisted that to take care of the mother's interest in the partnership she should be given by Clifford a half-section from the north ranch, clear of debts. Clifford thought the mother should be taken care of entirely outside of the trade of the two ranches, but Gene absolutely refused to trade on that basis. This dispute dragged along for some weeks and became more bitter between the two brothers. While the mother would have preferred to have continued their holdings as a partnership matter, she finally advised Clifford to accede to Gene's terms and dissolve the partnership.

On October 24, 1945, they had attorney Weber come out to Mrs. Farr's home in Newport, and in the big kitchen around the table they checked all of the properties described in each of the various deeds. A deed for a half-section from the north ranch was signed by Gene and his wife and Clifford and his wife, transferring this 320 acres to the mother, clear of encumbrance. The attorney testified that the mother hesitated about signing any deeds for a few minutes, but finally the mother, Clifford, and his wife signed the deed giving the south ranch to Gene, and Gene, his wife, and the mother signed the deed to the north ranch to Clifford, from which a half-section had been taken out to go to the mother. Gene testified that, after he made out a list of the property in each ranch and the debts against each one, he gave Clifford his choice of the two ranches, but Clifford implies that this was something of a bluff on Gene's part. The evidence is not very clear on that feature of the deal. After that time Gene and Clifford avoided having anything to do with each other as far as possible. The general store in Newport had been sold some years prior to this settlement, so each of the three brothers, Roy, Gene, and Clifford, now had their own lands and handled their own affairs.

On October 30, 1945, six days after these deeds had been signed up, the mother asked Clifford to call the attorney at Bassett and make an appointment for that

afternoon, as she wanted to make a new will. Clifford and his wife drove his mother to Bassett, where the mother and Clifford went into the county judge's office and got a will executed by her in January 1941 that had been deposited with the county judge. The three of them then went to the county attorney's office. She asked the county attorney to draw her a new will, handing him her old will, and telling him the changes she wished to have made in the new will. She had indicated right after the division of the ranch property that Gene had gotten all he would get from her. She left Gene but five dollars in this will, and the same amount to her two grandsons, but to Thelma Holiday, daughter of Fern Allen, who had lived with her and gone to school, as other grandchildren had done, she left $100.

It appeared from the evidence of the several witnesses present that the only discussion was as to the payment to her daughter Fern, who had then moved to Grand Island. She thought a cash bequest would be better than to leave her the home in Newport, as she had done in the first will, and decided to leave her $1,000. She asked Clifford how that could be paid, whether by a bond or in some other manner. Clifford said that if he was given time he could pay the cash. So the mother directed that Clifford pay to Fern Allen $1,000 within six months from the date of her death.

In the will, exhibit No. 1, the testatrix gave to her son Clifford in the residuary clause all of her property, covering the house in town and the 320 acres of land which had been deeded to her out of the north ranch six days before this will was written, out of which he was to pay the $1,000 to his sister Fern.

The evidence in this record from several witnesses is that the mother was a strong-minded woman, that she kept up with current events in the newspapers, that she took an interest in everything going on around her, and that her mind was certainly clear at the time she executed this will and she knew what she wanted to do for

each person. She did not die until more than a year after the will was executed.

Clifford absolutely denied that he ever suggested any particular provision in the will to his mother. There is evidence to the effect that Clifford lived with his mother several years after his father died, including a year or two after he was married, and that he handled all business affairs and was on much more friendly terms with his mother during all these years than the others. This question was asked and the answer given: "Q Did you do anything, by act or word, to try and influence your mother in regard to the conditions of her Will? A I did not."

We will now consider the law governing such cases. Under Nebraska law, we cannot try this case de novo on this appeal under the issues here. We are limited to the single question of the sufficiency of the evidence to sustain the verdict of the jury. See In re Estate of Kerr, 117 Neb. 630, 222 N. W. 63.

"No right of a citizen is more valued, and more assured by law, than the power to dispose of his property by will. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to the restrictions which are imposed by statute. Where a man has sufficient memory to make a will, and such instrument is not the result of undue influence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality." In re Estate of Bose, 136 Neb. 156, 285 N. W. 319.

Our court has held time after time that the burden of proving that the will resulted from undue influence is on the contestants, and the mere suspicion of undue influence on testatrix is insufficient to require the submission of that question to the jury. Even if some of the circumstances surrounding the execution of the will seem to support the hypothesis that undue influence entered into its preparation and execution, it still must be shown that such circumstances are inconsistent with the con-

trary hypothesis. See, Boggs v. Boggs, 62 Neb. 274, 87 N. W. 39; Spier v. Spier, 99 Neb. 853, 157 N. W. 1014; In re Estate of Dovey, 101 Neb. 11, 162 N. W. 134; In re Estate of Wilson, 114 Neb. 593, 208 N. W. 961.

Our latest cases have consistently followed the earlier ones to the effect that "The burden of proving that a will resulted from undue influence is on the contestants. Undue influence cannot be inferred. alone from motive or opportunity, and mere suspicion of undue influence on the testator is insufficient to require submission of the question to the jury." In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37. See, also, In re Estate of Alton, 128 Neb. 411, 258 N. W. 871; In re Estate of Keup, 145 Neb. 729, 18 N. W. 2d 63; In re Estate of Kajewski, 134 Neb. 485, 279 N. W. 185.

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence." In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284. See, also, In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75; In re Estate of Johnston, 147 Neb. 886, 25 N. W. 2d 526; In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80; In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513; In re Estate of Inda, *supra.*

" 'Influence, to vitiate a will, must be such as to amount to force and coercion, destroying the free agency of a testator, * * * and it must be shown that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which cannot be presumed, but must be proved, and in connection with the will and not with other things.' Bradford v. Vinton (Mich.) 26 N. W. Rep., 401." Latham v. Schaal, 25 Neb. 535, 41 N. W. 354. See, also, Stull v. Stull, 1 Neb. (Unoff.) 389, 96 N. W. 196.

Cases have arisen in disposing of property by deed

which are closely akin to undue influence in the execution of a will. This court has said in such cases: "Undue influence which will avoid a deed is an unlawful and fraudulent influence which controls the will of the grantor. The affection, confidence and gratitude of a parent to a child which inspires the gift is a natural and lawful influence, and will not render it voidable, unless this influence has been so used as to confuse the judgment and control the will of the donor." Blochowitz v. Blochowitz, 122 Neb. 385, 240 N. W. 586, 82 A. L. R. 949. See, also, Brugman v. Brugman, 93 Neb. 408, 140 N. W. 781.

When it is shown that proponent was a confidant of his mother, the testatrix, and did give her advice and suggestions, in discussing their business affairs, more than any or all of her other children, that does not in itself constitute undue influence unless it is shown that she was unable to resist adopting such advice. 68 C. J., Wills, § 437, p. 748.

Undue influence may be proved by circumstantial evidence, but it must be such as to substitute the will of the person exercising it for that of the testator. It must be equivalent to moral coercion. It must operate at the time the will is made and dominate and control its making. It is not established by proof of opportunity and disposition to exercise it. Importunity, request and persuasion that do not control the will are not enough. See, In re Estate of Hollis, 234 Iowa 761, 12 N. W. 2d 576; In re Estate of Mott, 200 Iowa 948, 205 N. W. 770.

In our opinion, the contestants failed to show that the testatrix was wrongly influenced or controlled by the proponent. It must be manifest that, within the rules hereinbefore announced, the evidence in the instant case was insufficient to support the claim of the contestants.

It is the duty of the trial court to determine the issues upon which there is competent evidence and submit them to the jury. In a will contest on the ground of undue influence, if the evidence is insufficient to sustain

a verdict in favor of the contestants, then the trial court should withdraw the issue from the jury and direct a verdict. See, In re Estate of Inda, *supra*; Johnson v. Anoka-Butte Lumber Co., 141 Neb. 851, 5 N. W. 2d 114; In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203.

We have reached the conclusion that the testimony in this case, taken as a whole, has failed to meet the burden of proof required under the authorities cited to support a charge of undue influence.

In this case the proponent moved for a directed verdict at the close of all the evidence. After the verdict was returned, the proponent on October 21, 1947, within ten days after the verdict was rendered, filed a motion to set aside the verdict and to enter judgment in favor of proponent in accordance with his motion for directed verdict. The judgment of the district court was rendered on January 8, 1948. The verdict, motion, and judgment all occurred after the effective date of sections 25-1315.02 and 25-1315.03, R. S. Supp., 1947. These sections were enacted pursuant to recommendation of the Judicial Council of Nebraska. Nebraska Legislative Journal 1947, pp. 167-168. Under the procedure authorized by section 25-1315.02, R. S. Supp., 1947, the district court had the power to set aside the verdict of the jury and "direct the entry of judgment as if the requested verdict had been directed." Under section 25-1315.03, R. S. Supp., 1947, this court on appeal from an order denying said motion "may order and direct judgment to be entered in favor of the party who was entitled to such judgment."

The appropriate course of this court, therefore, in the light of the new statutory procedure, is to reverse the judgment of the district court, with directions to set aside the verdict of the jury, and enter judgment for the proponent, on his motion for directed verdict, that the instrument offered for probate is the last will and testament of Addie Farr, deceased.

In view of this new procedure authorized by statute,

the opinion of this court on rehearing in the case of In re Estate of Witte, 145 Neb. 305, 17 N. W. 2d 477, is no longer controlling and applicable to the situation disclosed in the case at bar.

This judgment of the district court should be certified to the county court as provided in section 30-1607, R. S. 1943.

REVERSED AND REMANDED WITH DIRECTIONS.